# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,
STATE OF CALIFORNIA, STATE OF
DELAWARE, DISTRICT OF
COLUMBIA, STATE OF FLORIDA,
STATE OF HAWAII, STATE OF
ILLINOIS, STATE OF LOUISIANA,
COMMONWEALTH OF
MASSACHUSETTS, STATE OF
NEVADA, STATE OF TENNESSEE,
STATE OF TEXAS,
COMMONWEALTH OF VIRGINIA,
STATE OF GEORGIA, STATE OF
INDIANA, STATE OF MICHIGAN,
STATE OF MONTANA, STATE OF
NEW HAMPSHIRE, STATE OF NEW
MEXICO, STATE OF NEW YORK,
STATE OF NEW JERSEY,  STATE OF
OKLAHOMA, STATE OF RHODE
ISLAND, STATE OF WISCONSIN,
STATE OF CONNECTICUT, STATE OF
MINNESOTA, STATE OF NORTH
CAROLINA, STATE OF MARYLAND,
STATE OF COLORADO, CITY OF
NEW YORK, CITY OF CHICAGO, EX
REL.  PAUL DiMATTIA AND F.
FOLGER TUGGLE

   Plaintiffs,

  v.

CIVIL ACTION NO.  1 0 - 9 1 0

*FILED IN CAMERA
AND UNDER SEAL*  Unsealed
per order
of 2/10/15

*JURY TRIAL DEMANDED*

ASTRAZENECA LP
ASTRAZENECA PHARMACEUTICALS
LP

   Defendants.

## COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER
## THE *QUI TAM* PROVISIONS OF THE FEDERAL FALSE CLAIMS ACT AND
## SIMILAR STATE PROVISIONS

1.      Plaintiff/Relators Paul DiMattia ("Relator DiMattia") and F. Folger Tuggle

("Relator Tuggle") ("Relators") bring this action to recover treble damages and civil penalties on

behalf of the United States of America under the False Claims Act, 31 U.S.C. §§ 3729-33, and

the individual states and cities named herein arising from Defendants AstraZeneca LP's and

AstraZeneca Pharmaceuticals LP's (collectively "AstraZeneca" or "AZ") scheme to defraud and

conspire to defraud the United States and the states and local governments (hereinafter

collectively the "Government Plaintiffs") by causing the filing of false claims to be presented

under the Medicare, Medicaid, TRICARE and other federally-funded government health care

programs (collectively "Government Health Care Programs").

2.      Relators DiMattia and Tuggle were longtime executive employees of AZ as set

forth below.  They have firsthand knowledge of:  (1) AZ's payment of illegal financial

inducements in the hundreds of millions of dollars to Medco Health Solutions, Inc. ("Medco"),

in order to obtain favorable positioning of AZ's drug, Nexium, on Medco's formulary, and its

promotion and purchase of Nexium (a Proton Pump Inhibitor – heartburn medication); (2) AZ's

fraudulent conduct in circumventing its best price obligations as applied to Federal and State

government purchasers and reimbursers in connection with Nexium, with the knowledge that

said conduct would result in the submission of significant false claims; and  (3) AZ's resultant

conduct in violation of AZ's Corporate Integrity Agreement ("CIA"), effective in June 2003

through June 2008.

3.      AstraZeneca embarked on this course of unlawful conduct knowing it would lead

to the submission of substantial and myriad false claims for Nexium by participating

pharmaceutical providers to Government Health Care Programs, when by law these claims were

not reimbursable and would not have been reimbursed by the Government Health Care Programs

2

if the Government Plaintiffs had known the truth about AstraZeneca's illegal scheme and significant kickbacks paid in violation of the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b,) and in circumvention of its best price obligations.

4.      Relator Tuggle also asserts respective claims on his own behalf for unlawful retaliation and seeks appropriate statutory penalties and relief under the False Claims Act and applicable Delaware law. Relator Tuggle was terminated from his position at AZ on pretext following his objection to AZ's unlawful marketing practices. Seeing no other recourse, Relator has brought AZ's wrongdoing to the attention of the Government Plaintiffs.

## I.      JURISDICTION AND VENUE

5.      These claims arise under the *Qui Tam* provisions of the False Claims Act, 31 U.S.C. § 3729, *et. seq.* ("FCA"), and under the federal anti-kickback statute, 42 U.S.C. § 13209-7b(b). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 & 3730, and under 28 U.S.C. 1367(a).

6.      Personal jurisdiction and venue for this action are predicated on 31 U.S.C. § 3732(a) which provides: "any action brought under § 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants any one defendant, can be found, resides, transacts business or in which any act proscribed by § 3729 occurred." Defendants AstraZeneca LP and AstraZeneca Pharmaceuticals, LLP have their principal places of business in Delaware and transact substantial business in the District of Delaware.

7.      This Court also has supplemental jurisdiction over the claims brought pursuant to the California, Delaware, District of Columbia, Florida, Hawaii, Illinois, Louisiana, Massachusetts, Nevada, Tennessee, Texas, Virginia, Georgia, Indiana, Michigan, Montana, New Hampshire, New Mexico, New York, New Jersey, Oklahoma, Rhode Island, Wisconsin,

3

Connecticut, Minnesota, North Carolina, Maryland, Colorado, Chicago and New York City *Qui Tam* statutes pursuant to 28 U.S.C. § 1367 which provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

8.      The causes of action alleged herein are timely brought.  Moreover, efforts by AZ to conceal its wrongdoing from the United States in connection with the allegations made herein, occurred during all times relevant hereto, were ongoing, and continue to the present.

9.      Under the FCA, this Complaint is to be filed *in camera* and remain under seal for a period of at least 60 days and shall not be served on the defendant until the Court so orders. The government may elect to intervene and proceed with the action within 60 days after it receives both the Complaint and the material evidence and information.

## II.    PARTIES

10.     Relator DiMattia is a citizen and resident of the Commonwealth of Pennsylvania. He has held sales supervisory and executive commercial positions at AZ since 1988, and has been an employee of AZ or its predecessors for twenty-five years.  At the time of his departure from AZ in 2009, he was AZ's Executive Director of Commercial Operations.  Relator DiMattia brings this action on behalf of the United States of America and the states and local governments referenced herein.

11.     Relator Tuggle is a citizen and resident of the state of Vermont.  He has held executive sales or managed markets account positions at AZ since 1999, and has been an employee of AZ or its predecessors for fourteen years.  At the time of AZ's retaliation termination of Mr. Tuggle in 2009, he was AZ's Managed Markets Account Director - - Medco.

4

Relator Tuggle brings this action on behalf of the United States of America and the states and local governments referenced herein. Relator also asserts retaliation and related state-law claims on his own behalf.

12.　Relators bring this action based on their direct knowledge. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4). Notwithstanding same, each Relator is an original source of the facts alleged in this Complaint. As former highly placed AstraZeneca employees, each has direct and independent knowledge of the information regarding the allegations in this Complaint.

13.　Relators have personal knowledge of AZ's corporate endorsement of its national illegal scheme.

14.　Simultaneously with the filing of this Complaint, as required under the FCA, the Relators have provided to the Attorney General of the United States, the United States Attorney for the District of Delaware and the State Attorneys General of the states identified in this Complaint, a statement of all material evidence and information related to this Complaint. This disclosure statement supports the existence of false claims by AstraZeneca in the Government Health Care Programs.

15.　Defendants AstraZeneca LP and AstraZeneca Pharmaceuticals LP are Delaware limited partnerships with their principal place of business in Wilmington, Delaware. At all relevant times herein, AstraZeneca distributed, marketed and sold pharmaceutical products in the United States, including drugs sold under the trade names Nexium, Prilosec, Toprol XL and Plendil.

16.　At all times relevant hereto, AstraZeneca acted through its agents and employees, and the acts of AstraZeneca's agents and employees were within the scope of their agency and

5

employment. The policies and practices alleged in this Complaint were, on information and belief, established and/or ratified at the highest corporate levels of AstraZeneca.

## III.   INTRODUCTION

### A.   Applicable Legal Framework

#### 1.   The False Claims Act

17.     The FCA imposes liability upon any person who "knowingly presents or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; or "knowingly makes, uses, causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), (G).

18.     The FCA imposes liability not only for intentionally false or fraudulent conduct but also where the conduct is merely "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(B)(1).

19.     The FCA broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property…that…is made to a contractor, grantee or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, if the United States Government—(i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse any portion of the money or property requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

20.     A pharmaceutical company is liable under the FCA and the analogous state statutes, where, as here, its unlawful promotional practices and representations cause or mislead

healthcare providers into prescribing a drug and submitting reimbursement claims for prescriptions to the Government Health Care Programs.

### 2.     Government Health Care Programs

21.     Medicare is a government financial health insurance program administered by the Social Security Administration of the United States. Medicare was promulgated to provide payment for medical services, durable medical equipment and other related health items for individuals 65 and over. Medicare also makes payment for certain health services provided to additional classes of certain individual healthcare patients pursuant to federal regulations.

22.     The federal government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide health care to low-income individuals. 42 U.S.C. §§ 1396-1396v. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through the Center for Medicare and Medicaid Services ("CMS"). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. *See* 42 U.S.C. §§ 1396b(a)(l), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan ..." *See* 42 U.S.C. § 1396b(a)(l). This federal-to-state payment is known as federal financial participation ("FFP").

23.     TRICARE is the component agency of the U.S. Department of Defense that administers and supervises the health care program for certain military personnel and their dependents. TRICARE contracts with a fiscal intermediary that receives, adjudicates, processes and pays health care claims submitted to it by TRICARE beneficiaries or providers. The funds used to pay the TRICARE claims are federal government funds.

7

24.     In addition to Medicare, Medicaid and TRICARE, the federal government also reimburses for the cost of prescription drugs under several other Government Health Care Programs, including the Railroad Retirement Medicare Program, the Federal Employee Health Benefit Plans, the Veterans Administration, the Indian Health Service and State Legal Immigrant Assistance Grants.

### 3.     The Anti-Kickback Act

25.     The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration given to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

26.     The anti-kickback statute prohibits any person or entity from knowingly and willfully offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally-reimbursable medical goods or services:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to *induce such person*—
>
>> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

8

> (B) *to purchase, lease, order, or arrange for or recommend purchasing,*
> *leasing, or ordering any good, facility, service, or item for which payment*
> *may be made in whole or in part under a Federal health care program*,
> shall be guilty of a felony and upon conviction thereof, shall be fined not
> more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2) (emphasis added). Violation of the statute also can subject the

perpetrator to exclusion from participation in federal health care programs and, effective August

6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of

remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

27.     The government has deemed such misconduct material to its decision to pay

health care claims, in part through its requirement that providers certify compliance with this law

as a condition of payment under, and participation in, Government Health Care Programs. If the

Government Plaintiffs had been aware that AstraZeneca drugs, including Nexium, were

prescribed as a result of such prohibited conduct, the Government Plaintiffs would not have paid

the claims submitted as a result of AstraZeneca's wrongdoing.

28.     Congress enacted the Medicaid Drug Rebate Statute, 42 U.S.C. § 1396r-8, to

ensure that the Medicaid program would receive the benefit of the same discounts and prices on

drugs that other large public and private purchasers enjoyed. *See* H.R. Rep. No. 101-881, at 96

(1990), *reprinted in* 1990 U.S.C.C.A.N. 2017, 2108. Under the Medicaid Drug Rebate Statute,

in order for a brand name drug, such as Nexium, to be covered and reimbursed by the Medicaid

program, its manufacturer has two primary obligations. First, the manufacturer must report on a

quarterly basis to the Secretary of the Department of Health and Human Services ("HHS") the

drug's "average manufacturer price" and the "best price" offered for that drug. 42 U.S.C.

§ 1396r-8(b)(3)(A). Second, the manufacturer must pay each state a quarterly rebate equal to the

total number of drug units (*e.g.*, pills) purchased by the state times the greater of (1) 15.1 percent

9

of the drug's average manufacturer price, or (2) the difference between the average manufacturer price and the best price.  42 U.S.C. §1396r-8(c)(1)(A).

### 4.    **Formularies and Formulary Placement**

29.    A defining characteristic of the market for FDA-approved pharmaceutical products in the United States is the manner in which manufacturers are paid for and promote their products; in particular, the market is enormously influenced by the actions, methods, procedures, and decisions of the so-called "**payors**," including most prominently:  (a) pharmacy benefit managers ("PBMs"); (b) insurance companies; (c) managed-care companies (HMOs); and (d) self-insured companies.

30.    More than 200 million Americans have insurance coverage that includes a pharmacy benefit.  This pharmacy benefit is usually managed by a PBM, a business which specializes in administrating the patient's pharmacy benefit in return for payment by the client (usually either an employer, a health plan, a government agency, or a union).

31.    One information and belief, Medco is the largest PBM in the United States.  At all times relevant to this Complaint, Medco was AZ's largest commercial purchaser of AZ drugs, including Nexium.

32.    A formulary is a list of FDA-approved prescription drug medications, created to assist in maintaining the quality of patient care and containing costs for the patient's drug benefit plan.  Prescribers are requested to refer to the formulary when selecting prescription drug therapy for plan members.  Payors provide copies of their formularies to doctors, patients and pharmacists in their network to aid prescribers' adherence to the formulary.

33.    It is universally recognized that being included in the various payor formularies, and obtaining favorable placement of a drug within a formulary (*e.g.*, "Tier-2" placement),

10

drives demand for that drug within the payor's/PBM's entire network of physicians, pharmacists, and participating plans.

34.     As set forth in this Complaint, AZ paid hundreds of millions of dollars in inducements and kickbacks to Medco over the relevant period to obtain favorable formulary position, recommendation, and purchase of Nexium.

35.     This action is also brought to recover treble damages and civil penalties against AZ for causing Medco and its network physicians, pharmacists and plans to submit false claims to Medicaid and other Government Health Care Programs as a result of the illegal inducements and kickbacks that AZ paid to Medco in violation of the federal anti-kickback statute, during the period from 2004 to the present.

36.     Ignoring its aforementioned legal obligations, AZ never reported the substantial sums paid in illegal inducements to Medco to secure a favorable formulary position for Nexium, as discounts or rebates subject "best price," which would have significantly undercut Nexium's profitability.

37.     The illegal inducements/discounts and rebates AZ provided Medco were subject to "best price" reporting requirements.

38.     AZ's intentional circumvention and misreporting of its Nexium best price was intended by AZ to deprive, and fraudulently did deprive the federal government and states of discounts and/or reimbursement in the hundreds of millions of dollars or more over the relevant period.

39.     As set forth in this Complaint, this kickback/best price circumvention scheme was put in place at the highest levels of AZ, and by individuals who presently serve as President of AZ, United States; and the President of AZ, Canada, respectively.

11

40.     At all times relevant hereto, Defendant AZ has presented, conspired or knowingly caused to be presented, false claims seeking reimbursement for Nexium from Government Health Care Programs at prices other than the "best price" required by statute.

41.     At all times relevant hereto, AZ evaded its obligations under the best price statute in presenting, or causing to be presented, false claims to Government Health Care Programs for reimbursement, by fraudulently disguising rebates and discounts on Nexium, as value-added, in-kind discounts on other drugs.

42.     At all times relevant hereto, AZ knowingly and by its reclassification of its illegal "inducement" payments significantly underpaid rebates to Government Health Care Programs for Nexium.  Nexium sales in the United States during the relevant period are approximately $21 Billion.

43.     AZ and its employees understood that it was a violation of the anti-kickback statute to offer or to pay remuneration, by whatever means, to induce Medco to purchase and/or to recommend or promote the prescription or use of Nexium.

44.     AZ and its employees understood that it was a violation of law to pay said remuneration as a substitute for discounts or rebates that, if disclosed, would increase AZ's financial obligations to Government Health Care Programs.

45.     These illegal practices regarding the manipulation of formularies and with it, patient drug recommendations and selection, were based on economic considerations and the enrichment of AZ, rather than on efficacy and patient welfare.

## B.    Factual Overview

### 1.    AZ's Criminal Guilty Plea and Civil Settlement
### In Connection With Its Illegal Marketing of Zoladex

46.    On June 20, 2003, AZ pled guilty to the crime of conspiring to violate the

Prescription Drug Marketing Act in connection with its illegal marketing of its drug Zoladex.

47.    As admitted in the guilty plea, AZ's criminal conduct caused losses of

approximately $40 Million ($40,000,000) to Medicare, Medicaid and other federally funded

insurance programs.  As part of the plea agreement, AZ agreed to pay a fine of approximately

$64 Million ($64,000,000).

48.    At the same time, AstraZeneca entered into a civil settlement agreement with the

federal government in the additional amount of $266 Million ($266,000,000), in settlement of the

government's allegations that over a twelve year period, i.e., from January 1991 through

December 31, 2002, AstraZeneca engaged in conduct involving the illegal marketing, sale, and

pricing of its drug Zoladex, including as follows:

*        *        *

> *(v)    AstraZeneca misreported and underpaid its Medicaid
> rebates for Zoladex used for treatment of prostate cancer, i.e., the
> amounts that it owed to the states under the federal Medicaid
> Rebate Program. . . . AstraZeneca falsely reported the Best Price
> for Zoladex used for treatment of prostate cancer because
> AstraZeneca calculated its Best Prices for Zoladex without
> accounting for off-invoice price concessions provided in various
> forms including cash discounts in the form of grants, services
> and free goods contingent on any purchase requirement.*
> (emphasis added)

49.    A condition of AZ's settlement of government claims and charges was that it

enter a "Corporate Integrity Agreement" ("CIA") with the Office of Inspector General of HHS.

The five year term of the CIA ran from its effective date of June 4, 2003, through to its

expiration date of June 4, 2008.

13

50.     A critical term of that CIA was that AZ adhere to all state and federal laws and regulations in the sale and marketing of its products.

51.     AZ's conduct as described herein was in knowing violation of those terms in its CIA, and in various respects paralleled its illegal Zoladex marketing.

## 2.     AZ's Civil Settlement In Connection With Its Illegal Marketing of Seroquel

52.     On April 27, 2010, AstraZeneca entered into a Settlement Agreement with the Federal Government and various states in the amount of Five Hundred Twenty Million Dollars ($520,000,000) to settle the government's allegations of AZ's illegal conduct in the marketing of its drug, Seroquel, during the period January 1, 2001 through December 31, 2006, including in prominent part, that AZ offered and paid "illegal remuneration" in its marketing of Seroquel "in violation of the Federal Anti-Kickback Statute."

53.     The activity punished by that agreement was similarly in direct violation of the CIA of June 20, 2003.

54.     On April 27, 2010, AZ was again required to enter into a CIA.

## 3.     AZ's Illegal Conduct -- Overview

55.     AZ's illegal conduct was not confined to its illegal sale and marketing of the drugs, Zoladex and Seroquel. Rather, it extended to the drug, Nexium, whose sales in the United States exceed $21 Billion over the relevant period.

56.     AZ's illegal conduct concerning Nexium during the relevant period includes, *inter alia*, (1) providing illegal financial inducements in the hundreds of millions of dollars to secure preferred formulary placement, recommendation, and purchase of Nexium; (2) falsely reporting the "best price" of Nexium by not properly accounting for these quid pro quo financial inducements as Nexium product discounts or rebates; and (3) violating its CIA.

14

DM1\2339799.3

57.    As set forth in this Complaint, much of AZ's illegal conduct regarding Nexium took place while AZ was under federal investigation for the illegal marketing of Seroquel and while AZ was negotiating a settlement of that conduct with the government - - and continues this day.

58.    AZ knowingly made illegal in-kind value payments to Medco in order to induce it to: 1) provide Nexium with a preferred tier position on its formulary; 2) recommend Nexium to network physicians and subscribers via favorable formulary placement; and 3) buy Nexium.

59.    AZ knowingly conspired with Medco so that Medco would do so even where other ("less favored") competitor drugs were cheaper to patients or plans, or had less expensive equivalents to the "favored" drug, Nexium.

60.    In several instances as set forth herein, AZ entered into agreements with the manufacturers of less expensive generic competitor drugs, requiring the generic manufacturer to refrain from selling those less expensive drugs to Medco in order to maintain the value of the in-kind financial inducements being made to Medco.

## IV.    AZ'S ILLEGAL INDUCEMENTS/ILLEGAL CIRCUMVENTION OF BEST PRICE

61.    During the relevant period, the Federal Government was AZ's largest overall customer for its prescription drugs, including Nexium.

62.    During the relevant period, Medco was AZ's largest commercial customer for its prescription drugs, including Nexium.

63.    During the relevant period, Medco was receiving AZ's "best price" in connection with Nexium.

64. In 2004, AZ agreed to provide Medco with additional Nexium discounts of approximately 10% in return for Nexium's preferred placement on Medco's formulary and Medco's promotion and direct purchase of the drug.

65. The approximate value of the 10% Nexium discount to Medco was $100 Million. Therefore, in 2004, AZ agreed to pay Medco $100 Million as an inducement for Nexium's preferred placement on Medco's formulary, its network recommendations and purchases. Said AZ $100 Million financial inducement was in violation of the federal anti-kickback statute.

66. The 10% or $100 Million discount to Medco in connection with Nexium, properly reported as such by AZ, would have resulted in a new and lower best price for Nexium, and with it, significantly lower costs and/or higher rebates to all Government Health Care Program purchasers and reimbursers nationally, and would have significantly reduced Nexium's overall profitability with sales in the United States at approximately $3 Billion annually by 2004.

67. In order to circumvent its best price obligations for Nexium and maintain Nexium's profitability at government expense, AZ fraudulently disguised said $100 Million in Nexium quid pro quo discounts, in the form of deep discounts to Medco for AZ's drug Prilosec, having a value to Medco of approximately $100 Million.

68. AZ's $100 Million in-kind financial inducement to Medco to maintain Nexium's favorable formulary position, masking an additional 10% Nexium discount, was specifically intended by AZ to circumvent AZ's best price Government Health Care Program obligations as to Nexium, and therefore was intended to defraud, and did significantly defraud, government purchasers and reimbursers in connection with Nexium purchases and reimbursements.

69. A hidden additional 10% discount, unreported for "best price," translates into overpayments by government entities of hundreds of millions of dollars, if not more, in

16

connection with AZ's $3 Billion per year drug, Nexium - - all fraudulently going directly to AZ's bottom line.

70.     Said illegal scheme was developed and put in place at the highest levels of AZ, and included as its architects, Richard Fante, then VP of Commercial Operations - - Nexium (now, President, AZ United States), Linda Palczuk, then Executive Director of Commercial Operations - - Nexium (now Executive Director, Commercial Operations) and Mike Tilton, then National Sales Director (now Vice President U.S. Sales).

71.     Said illegal conduct took place in 2004 following AZ's 2003 admission of criminal guilt in connection with AZ's Zoladex pricing/best price violations (see para. 48 above) and in violation of AZ's CIA (effective June 2003) - - and reflects AZ's ongoing corporate strategy of profits over compliance in defiance of applicable law.

72.     By 2007, additional financial inducements/kickbacks to Medco were necessary in order for AZ to maintain Nexium's preferred placement on Medco's formulary and the Nexium purchases and recommendations that resulted therefrom.  For that reason, AZ's senior management agreed to pay Medco *an additional $40 Million per year*, from 2007 through 2010, to maintain Nexium's preferred formulary position.

73.     In order to circumvent its best price obligations under applicable law, and thereby maintain Nexium's profitability at government expense, AZ fraudulently disguised the additional Nexium discounts by providing in-kind kickbacks to Medco via steep discounts in several of AZ's more "mature" drugs, including Toprol XL, Prilosec, and Plendil -- having a value to Medco of *$40 Million per year from 2007 through 2010. See* AZ "Confidential" documents reflecting this shifting of additional other-product discounts in support of Nexium, including "Proposed Terms and Value: Nexium, Effective - - 1/1/08 until 12/23/10," collectively attached

17

hereto as Exhibit "A". *See also* internal AZ and Medco, Nexium "Value Tracking" other-product discount *spreadsheets*, tracking the Nexium- related "value to Medco," of said other-product additional discounts on a quarterly basis through December 2008 - - collectively attached hereto as Exhibit "B".

74.     This continuation of AZ's illegal conduct was maintained at the highest levels of AZ, and included Marion McCourt, then VP of Commercial Operations - - Nexium and Azenity brands (Toprol XL, Prilosec and Plendil), now, President, AZ Canada; and Donald Sawyer, then, Vice President of Managed Markets.

75.     In order that the $40 Million value of its Nexium-related annual subterfuge inducements be maintained and AZ's best price obligations effectively circumvented, AZ entered into an agreement with a generic drug company, by which the company was *prohibited* from selling its FDA authorized generic of Toprol XL to Medco. (*See* relevant portion of Agreement Executive Summary dated September 22, 2006, reflecting said prohibition - - Exhibit "C"). Similarly, and for the same purpose, AZ entered into an agreement with a second generic drug company by which that company was *prohibited* from selling its FDA-authorized generic of Prilosec to Medco.

76.     Aware that these subterfuge $40 Million per year in-kind financial inducements in connection with Nexium were in violation of AZ's best price obligations, these meetings were held in secret, agreements were not reduced to writing, and any written materials were handed back to a single AZ individual at the conclusion of each meeting.

77.     These actions were consistent with AZ's practice under Marion McCourt to eliminate or reduce any incriminating paper trail to the extent possible. *See, e.g.,* attached email string dated January 17 and 18, 2008, to Relator DiMattia, referencing "Marion" and noting that

18

DM1\2339799.3

"legal always advises us to . . . be less communicative in our messaging." (Emails attached hereto as Exhibit "D").

78.     However, Relator Tuggle, personally attended these meetings in his capacity as Managed Markets Account Director - - Medco, and maintained a copy of the subterfuge $40 Million value transmission spreadsheets - - collectively Exhibit "B" - - which effectively reflect the illegal AZ transaction.

79.     Relator Tuggle specifically complained to senior management, including specifically to Donald Sawyer among others, that the aforementioned transactions were in violation of AZ's best price requirements and were illegal.  In response, he was retaliated against by AZ, harassed and finally terminated on pretext.

80.     The in-kind payments to Medco were specifically devised as a subterfuge by AZ to avoid paying discounts or rebates that would have affected the Medicaid best price for Nexium, while acting as kickbacks to Medco in return for securing or maintaining Nexium preferred placement on Medco's formulary.

81.     By said in-kind inducements/subterfuge payments to Medco as described herein - - not properly accounted for by AZ as discounts and rebates - - AZ knowingly and significantly overstated its Nexium "best price" and knowingly and significantly overcharged government purchasers and/or underpaid rebates on Nexium to the Medicaid Program.

## V.     AZ'S KNOWING, INTENTIONAL AND PERVASIVE VIOLATION/CIRCUMVENTION OF THE CIA

82.     During the period of the CIA (from June 4, 2003 to June 4, 2008), virtually all of the conduct set forth above - - AZ's inducements to Medco and intentional circumvention of its best price obligations - - were in direct violation of AZ's CIA, and replicated and continued the very AZ illegal Zoladex conduct that led to the 2003 AZ criminal guilty plea and the CIA itself.

83.     In addition, during much of the relevant period, AZ continued to engage in this illegal conduct in connection with Nexium, while aware that it was then also under investigation by the Department of Justice in connection with its illegal marketing practices, including financial inducements, as to Seroquel.

## VI.   ASTRAZENECA HAS CAUSED THE SUBMISSION OF FALSE CLAIMS AND RECORDS

84.     AstraZeneca  has embarked upon this course of unlawful conduct knowing it would lead to the submission of a myriad of claims for Nexium by Medicare and Medicaid-participating providers, when by law these claims were not reimbursable and would not have been reimbursed by Government Health Care Programs had the truth about AstraZeneca's illegal practices been known.

## COUNT I

## FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1) (1986)

85.     Relators DiMattia and Tuggle repeat and reallege paragraphs 1 through 84 of this Complaint as if fully set forth herein.

86.     As a result of AZ's financial inducement or in-kind kickbacks to induce Medco to provide favorable formulary position, purchase and recommend the purchasing or prescribing of AZ's drug, Nexium, in violation of the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2), all of the claims that AZ caused Medco, its network physicians, pharmacists and plans to present to Medicaid or other Government Health Care Programs for those drugs are false or fraudulent. Accordingly, AZ knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1) (1986).

20

87.    By virtue of the false or fraudulent claims AZ knowingly caused to be presented,

the United States and state Medicaid programs have suffered actual damages and been damaged

by the payment of false and fraudulent claims.

WHEREFORE, Relators respectfully requests this Court to award the following

damages to the following parties and against AZ:

To the United States:

(1)    Three times the amount of actual damages which the United States
has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000
for each false claim which Defendant caused to be presented to the
United States;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to § 3730(d) of the FCA
and/or any other applicable provision of law;

(2)    Reimbursement for  reasonable expenses which Relators incurred
in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT II

### FALSE CLAIMS ACT:  31 U.S.C. § 3729(a)(1)(B) (2009)

88.    Relators DiMattia and Tuggle repeat and reallege paragraphs 1 through 84 of the

Complaint as if fully set forth herein.

89.    AZ knowingly caused Medco, its network physicians, pharmacists and plans to

make or use false records or statements material to false or fraudulent claims paid or approved by

the Government Health Care Programs, in violation of 31 U.S.C. § 3729(a)(1) (B) (2009). The

false records or statements were their false certifications and representations of full compliance

with all federal and state laws and regulations prohibiting fraudulent acts and false reporting,

including but not limited to the anti-kickback statute, 42 U.S.C. § 1320a-7b.

90.     By virtue of the false records or statements AZ caused Medco, its network

physicians, pharmacists and plans to make or use, the United States and state Medicaid programs

have suffered actual damages and been damaged by the payment of false and fraudulent claims.

WHEREFORE, Relators respectfully requests this Court to award the following

damages to the following parties and against AZ:

To the United States:

(1)     Three times the amount of actual damages which the United States
        has sustained as a result of Defendant's conduct;
(2)     A civil penalty of not less than $5,500 and not more than $11,000
        for each false claim which Defendant caused to be presented to the
        United States;
(3)     Prejudgment interest; and
(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to § 3730(d) of the FCA
        and/or any other applicable provision of law;
(2)     Reimbursement for reasonable expenses which Relators incurred
        in connection with this action;
(3)     An award of reasonable attorney's fees and costs; and
(4)     Such further relief as this Court deems equitable and just.

## COUNT III

### FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(3) (1986)

91.     Relators DiMattia and Tuggle repeat and reallege paragraphs 1 through 84 of this

Complaint as if fully set forth herein.

92.     AZ conspired with Medco to pay financial inducements or in-kind kickbacks to

Medco in violation of the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2), in order to

induce Medco's purchase, favorable formulary placement, promotion and recommendation of

22

Nexium, thereby causing all of Medco's, its network physicians', pharmacists' and plans' claims to Medicaid for Nexium to be false or fraudulent. Accordingly, AZ conspired to defraud the United States by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3) (1986).

93.     By virtue of the false or fraudulent claims AZ conspired to get allowed or paid, the United States and the state Medicaid programs have suffered actual damages.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the United States:

(1)     Three times the amount of actual damages which the United States has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the United States;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to § 3730(d) of the FCA and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT IV

## VIOLATION OF BEST PRICE (MEDICAID DRUG REBATE STATUTE)

94.     Relators DiMattia and Tuggle repeat and reallege paragraphs 1 through 84 of this Complaint as if fully set forth herein.

95.     As a result of the specific and intended failure of AZ to report its actual best price for Nexium as required by law, government purchasers and reimbursers of Nexium were

23

overcharged and/or were underpaid required rebates in the hundreds of millions of dollars if not more.

96.     By virtue of AZ's false or fraudulent claims and violation of the Medicaid Drug Rebate Statute, the United States and the state Medicaid programs have suffered actual damages.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the United States:

(1)     Three times the amount of actual damages which the United States has sustained as a result of Defendant's conduct;
(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the United States;
(3)     Prejudgment interest; and
(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to § 3730(d) of the FCA and/or any other applicable provision of law;
(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3)     An award of reasonable attorney's fees and costs; and
(4)     Such further relief as this Court deems equitable and just.

## COUNT V

## UNJUST ENRICHMENT

97.     Relators DiMattia and Tuggle repeat and reallege paragraphs 1 through 84 of this Complaint as if fully set forth herein.

98.     The United States claims the recovery of all monies by which AZ has been unjustly enriched, including profits earned by AZ because of illegal inducements AZ paid to Medco and false reporting of best price for Nexium.

24

99.     By obtaining monies as a result of its violations of federal and state law, AZ was unjustly enriched, and is liable to account and pay such amounts, which are to be determined at trial, to the United States.

100.    By this claim, the Relators, in behalf of the United States, request a full accounting of all revenues (and interest thereon) and costs incurred by AZ on sales of Nexium that are related to AZ's violations of federal law, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

WHEREFORE, the Relators respectfully request this Court enter judgment in favor of the United States as follows:

for unjust enrichment, for the damages sustained and/or amounts by which AZ retained illegally obtained monies, plus interest, costs, and expenses, and such further relief as may be just and proper.

## COUNT VI

## RETALIATION AND VIOLATION OF 31 U.S.C. §3730(H)

## F. FOLGER TUGGLE VS. ASTRAZENECA

101.    Relator Tuggle repeats and realleges paragraphs 1 through 84 of this Complaint as if fully set forth herein.

102.    At all times material hereto, AZ was an employer covered by 31 U.S.C. § 3730(h).  Section 3730(h) precludes discharge, demotion or retaliation against employees who investigate, provide testimony or assistance in any action filed or to be filed under the False Claims Act, 31 U.S.C. § 3729.

103.    Relator Tuggle's discharge as set forth above was in violation of 31 U.S.C. § 3730(h).

104.    As a direct and proximate result of the retaliation, harassment, threats and

discharge by AZ, Relator Tuggle suffered and incurred and continues to suffer and incur

substantial loss of past and future earnings; compensation and other benefits and monies; harm

and damage to Relator's professional reputation and credibility by being wrongfully discharged

in violation of public policy and with the false implication and statements to employees,

prospective employers and others in the community that Relator Tuggle was terminated for

reasons unrelated to the aforementioned refusal to acquiesce and the potential to disclose, AZ's

illegal and fraudulent conduct as set forth herein.

105.    AZ's conduct was malicious, fraudulent and oppressive and in violation of public

policy and a violation of 31 U.S.C. §3730(h).

WHEREFORE, Relator Tuggle requests that judgment be entered against

Defendant in his favor and that he be awarded any and all relief pursuant to 31 U.S.C. §3730(h)

including, but not limited to:

        a.    Two times the amount of back pay;

        b.    Interest on back pay;

        c.    Any and all other compensatory and special damages;

        d.    All litigation and reasonable attorney's fees;

        e.    Punitive damages; and

        f.    Any such further relief that this Court deems appropriate.

## COUNT VII

## CALIFORNIA FALSE CLAIMS ACT

106.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

26

107. This is a *qui tam* action brought by Relators on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

108. Cal. Gov't Code § 12651 (a) provides liability for any person who

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;
>
> (3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.
>
> . . .
>
> (8) is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

109. In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code § 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code §14107.2.

110. AZ violated Cal. Bus. & Prof. Code § 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 by engaging in the conduct described herein.

111. AZ furthermore violated Cal. Gov't Code § 12651 (a) and knowingly caused false claims to be made, used and presented to the State of California by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, Cal. Bus. & Prof. Code § 650-650,1 and Cal. Welf. & Inst. Code § 14107.2 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs.

27

112.    The State of California, by and through the California Medicaid program and other state healthcare programs, and unaware of AZ's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

113.    Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of California in connection with AZ's conduct.  Compliance with applicable California statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of California.

114.    Had the State of California known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

115.    As a result of AZ's violation of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

116.    Relators are each  private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the State of California:

(1)    Three times the amount of actual damages which the State of California has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5000 and not more than $10,000 for each false claim which Defendant presented or caused to be presented to the State of California;
(3)    Prejudgment interest; and

28

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to Cal. Gov't Code
§ 12652 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred
in connection with this action;

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT VIII

## DELAWARE FALSE CLAIMS AND REPORTING ACT

117.   Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

118.   This is a *qui tam* action brought by Relators on behalf of the State of Delaware to

recover treble damages and civil penalties under the Delaware False Claims and Reporting Act,

Title 6, Chapter 12 of the Delaware Code.

119.   6 Del. C. § 1201(a) provides liability for any person who-

(1)     knowingly presents, or causes to be presented, directly or
indirectly, to an officer or employee of the Government a false or
fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, directly or
indirectly, a false record or statement to get a false or fraudulent claim
paid or approved; or

(3)     conspires to defraud the Government by getting a false or
fraudulent claim allowed or paid.

120.   In addition, 31 Del. C. § 1005 prohibits the solicitation or receipt of any

remuneration (including kickbacks, bribes or rebate) directly or indirectly, overtly or covertly, in

cash or in kind in return for the furnishing of any medical care or services for which payment

may be made in whole or in part under any public assistance program.

121.   AZ violated 31 Del. C. § 1005 by engaging in the conduct described herein.

29

122. AZ furthermore violated 6 Del. C. § 1201(a) and knowingly caused false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws, including the FCA, the Anti-Kickback Act, and 31 Del. C. § 1005 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

123. The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, was unaware of Defendant's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

124. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with AZ's conduct. Compliance with applicable Delaware statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Delaware.

125. Had the State of Delaware known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

126. As a result of AZ's violation of 6 Del. C. § 1201(a), the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

127. Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 6 Del. C. § 1203(b) on behalf of themselves and the State of Delaware.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

30

To the State of Delaware:

    (1)    Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Delaware;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to 6 Del C. § 1205, and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorney's fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT IX

### FLORIDA FALSE CLAIMS ACT

128.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in paragraphs 1 through 84 above as if fully set forth herein.

129.    This is a *qui tam* action brought by Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

130.    Fla. Stat. § 68.082(2) provides liability for any person who-

    (a)    knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;

    (b)    knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

    (c)    conspires to submit a false or fraudulent claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

131.    In addition, Fla. Stat. § 409.920 makes it a crime to:

31

(c) knowingly charge, solicit, accept, or receive anything of value, other than an authorized copayment from a Medicaid recipient, from any source in addition to the amount legally payable for an item or service provided to a Medicaid recipient under the Medicaid program or knowingly fail to credit the agency or its fiscal agent for any payment received from a third-party source;

\* \* \*

(e) knowingly, solicit, offer, pay or receive any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing of any item or service for which payment may be made, in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging, for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Medicaid program.

132.    Fla. Stat. §456.054(2) also prohibits the offering, payment, solicitation, or receipt of a kickback to a healthcare provider, whether directly or indirectly, overtly or covertly, in cash or in kind, in exchange for referring or soliciting patients.

133.    AZ violated Fla. Stat. § 409.920(c) and (e) and §456.054(2) by engaging in the conduct described herein.

134.    AZ furthermore violated Fla. Stat. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, Fla. Stat. § 409.920(c) and (e) and §456.054(2) and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

135.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, was unaware of Defendant's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

32

136.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Florida in connection with AZ's

conduct.  Compliance with applicable Florida statutes, regulations and Pharmacy Manuals was

also an express condition of payment of claims submitted to the State of Florida.

137.    Had the State of Florida known of AZ's wrongful conduct in connection with

Nexium, it would not have paid the claims submitted by healthcare providers and third party

payers in connection with that conduct.

138.    As a result of AZ's violation of Fla. Stat. § 68.082(2), the State of Florida has

been damaged in an amount far in excess of millions of dollars exclusive of interest.

139.    Relators are each private citizens with direct and independent knowledge of the

allegations of this Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on

behalf of themselves and the State of Florida.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against AZ:

To the State of Florida:

(1)    Three times the amount of actual damages which the State of Florida has
       sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5,500 and not more than $ 11,000 for
       each false claim which Defendant caused to be presented to the State of
       Florida;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any
       other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relators incurred in
       connection with this action,

33

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT X

### GEORGIA FALSE MEDICAID CLAIMS ACT

140.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

141.    This is a *qui tam* action brought by Relator on behalf of the State of Georgia to

recover treble damages and civil penalties under the Georgia False Medicaid Claims Act,

O.C.G.A. §49-4-168(2008) *et seq.*

142.    O.C.G.A. § 49-4-168.1(a) provides liability for any person who:

(1)     knowingly presents, or causes to be presented to the Georgia Medicaid
program a false or fraudulent claim for payment or approval;
(2)     knowingly makes, uses, or causes to be made or used, a false record or
statement to get a false or fraudulent claim paid or approved by the Georgia
Medicaid program;
(3)     conspires to defraud the Georgia Medicaid program by getting a false or
fraudulent claim allowed or paid.

143.    AZ violated O.C.G.A. § 49-4-168 *et seq.* by engaging in the conduct described

herein.

144.    AZ furthermore violated O.C.G.A. § 49-4-168 and knowingly caused false claims

to be made, used and presented to the State of Georgia by its deliberate and systematic violation

of federal and state laws, including the FCA, federal Anti-Kickback Act, by virtue of the fact that

none of the claims submitted in connection with its conduct were even eligible for

reimbursement by the government-funded healthcare programs.

145.    The State of Georgia, by and through the Georgia Medicaid program and other

state healthcare programs, was unaware of Defendant's conduct and paid the claims submitted by

healthcare providers and third party payers in connection therewith.

34

146. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with AZ's conduct. Compliance with applicable Georgia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Georgia.

147. Had the State of Georgia known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

148. As a result of AZ's violation of O.C.G. A. § 49-4-168, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

149. Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to O.C.G. A. § 49-4-168 on behalf of himself and the State of Georgia.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the State of Georgia:

(1) Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendant's conduct;
(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Georgia;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to O.C.G.A. § 49-4-168 and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

35

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XI

## HAWAII FALSE CLAIMS ACT

150.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

151.    This is a *qui tam* action brought by Relator on behalf of the State of Hawaii to

recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat.

§ 661-21 *et seq.*

152.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who-

(1)     knowingly presents, or causes to be presented, to an officer or employee
        of the state a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or
        statement to get a false or fraudulent claim paid or approved by the state;

(3)     conspires to defraud the state by getting a false or fraudulent claim
        allowed or paid; or
        * * *

(8)     is a beneficiary of an inadvertent submission of a false claim to the State,
        who subsequently discovers the falsity of the claim, and fails to disclose
        the false claim to the State within a reasonable time after discovery of the
        false claim.

153.    AZ violated Haw. Rev. Stat. §661-21(a) and knowingly caused false claims to be

made, used and presented to the State of Hawaii by its deliberate and systematic violation of

federal and state laws, including the FCA and Anti-Kickback Act, and by virtue of the fact that

none of the claims submitted in connection with its conduct were even eligible for

reimbursement by the government-funded healthcare programs.

154.    The State of Hawaii, by and through the Hawaii Medicaid program and other state

healthcare programs, was unaware of AZ's conduct and paid the claims submitted by healthcare

providers and third party payers in connection therewith.

36

155.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of Hawaii in connection with AZ's conduct.  Compliance with applicable Hawaii statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Hawaii.

156.    Had the State of Hawaii known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

157.    As a result of AZ's violation of Haw. Rev. Stat § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

158.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev, Stat. § 661-25(a) on behalf of himself and the State of Hawaii.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the State of Hawaii:

(1)    Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendant's illegal conduct;
(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Hawaii;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Haw. Rev. Stat. §661 -27 and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

37

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XII

### ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT

159.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

160.    This is a *qui tam* action brought by Relator on behalf of the State of Illinois to

recover treble damages and civil penalties under the Illinois Whistleblower Reward and

Protection Act, 740 111. Comp. Stat. 175 *et seq.*

161.    740 111. Comp. Stat. 175/3(a) provides liability for any person who:

(1)     knowingly presents, or causes to be presented, to an officer or employee
        of the State of a member of the Guard a false or fraudulent claim for
        payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or
        statement to get a false or fraudulent claim paid or approved by the State;

(3)     conspires to defraud the State by getting a false or fraudulent claim
        allowed or paid.

162.    In addition, 305 111. Comp. Stat. 5/8 A-3(b) of the Illinois Public Aid Code

(Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration,

including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in

kind in return for furnishing any item or service for which payment may be made in whole or in

part under the Illinois Medicaid program.

163.    AZ violated 305 111. Comp. Stat. 5/8A-3(b) by engaging in the conduct described

herein.

164.    AZ furthermore violated 740 111. Comp. Stat. 175/3(a) and knowingly caused

false claims to be made, used and presented to the State of Illinois by its deliberate and

systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act,

38

and the Illinois Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

165.    The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

166.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with AZ's conduct. Compliance with applicable Illinois statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Illinois.

167.    Had the State of Illinois known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third parry payers in connection with that conduct.

168.    As a result of AZ's violation of 740 111. Comp. Stat. 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

169.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 740 111 Comp. Stat. 175/3(b) on behalf of himself and the State of Illinois.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the State of Illinois:

(1)    Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendant's conduct;

39

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Illinois;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to 740 111. Comp. Stat. 175/4(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XIII

## INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT

170.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

171.    This is a *qui tam* action brought by Relator on behalf of the State of Indiana to

recover treble damages and civil penalties under the Indiana False Claims and Whistleblower

Protection Act, Indiana Code 5-11-5.5 *et seq.* provides:

Sec. 2.(b) A person who knowingly or intentionally:

(1)     presents a false claim to the state for payment or approval;

(2)     makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

(3)     with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;

(4)     with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

(5)     receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

(6)     makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

(7)     conspires with another person to perform an act described in subdivisions (1) through (6); or

40

(8)     causes or induces another person to perform an act described in
subdivisions (1) through (6)...

172.    In addition, Indiana Code 5-11-5.5 *et seq.* prohibits the solicitation or receipt of

any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or

covertly, in cash or in kind in return for furnishing any item or service for which payment may

be made in whole or in part under the Indiana Medicaid program.

173.    AZ violated the Indiana Code 5-11-5.5 *et seq.* by engaging in the conduct

described herein.

174.    AZ furthermore violated Indiana Code 5-11 -5.5 *et seq.* and knowingly caused

false claims to be made, used and presented to the State of Indiana by its deliberate and

systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act,

and the Indiana Vendor Fraud and Kickback statute, and by virtue of the fact that none of the

claims submitted in connection with its conduct were even eligible for reimbursement by the

government-funded healthcare programs.

175.    The State of Indiana, by and through the Indiana Medicaid program and other

state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by

healthcare providers and third party payers in connection therewith.

176.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Indiana in connection with AZ's

conduct.  Compliance with applicable Indiana statutes, regulations and Pharmacy Manuals was

also an express condition of payment of claims submitted to the State of Indiana.

41

177.    Had the State of Indiana known of AZ's wrongful conduct in connection with

Nexium, it would not have paid the claims submitted by healthcare providers and third party

payers in connection with that conduct.

178.    As a result of AZ's violation of Indiana Code 5-11-5.5 *et seq.*, the State of Indiana

has been damaged in an amount far in excess of millions of dollars exclusive of interest.

179.    Relators are each private citizens with direct and independent knowledge of the

allegations of this Complaint, who has brought this action pursuant to Indiana Code 5-11-5.5 *et

seq.* on behalf of himself and the State of Indiana.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against AZ:

To the State of Indiana:

(1)    Three times the amount of actual damages which the State of Indiana has
sustained as a result of Defendant's conduct;

(2)    A Civil penalty of at least five thousand dollars ($5,000);

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Indiana Code 5-11-5.5 *et seq.*
and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred  in
connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XIV

## LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

180.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

42

181.    This is a *qui tam* action brought by Relator on behalf of the State of Louisiana to

recover treble damages and civil penalties under the Louisiana Medical Assistance Programs

Integrity Law, La. Rev. Stat. 46: 437.1 *et seq.*

182.    La. Rev. Stat. 46: 438.3 provides-

(A)    No person shall knowingly present or cause to be presented a false
or fraudulent claim;

(B)    No person shall knowingly engage in misrepresentation to obtain,
or attempt to obtain, payment from medical assistance program
funds;

(C)    No person shall conspire to defraud, or attempt to defraud, the
medical assistance programs through misrepresentation or by
obtaining, or attempting to obtain, payment for a false or
fraudulent claim;

183.    In addition, La. Rev. Stat. 46:43 8.2(A) prohibits the solicitation, receipt, offering

or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or

indirectly, overtly or covertly, in cash of in kind, for furnishing healthcare goods or services paid

for in whole or in part by the Louisiana medical assistance programs.

184.    AZ violated La. Rev. Stat. 46:438.2(A) by engaging in the conduct described

herein.

185.    AZ furthermore violated La. Rev. Stat. 46:43 8.3 and knowingly caused false

claims to be made, used and presented to the State of Louisiana by its deliberate and systematic

violation of federal and state laws, including the FCA, federal Anti-Kickback Act and La. Rev.

Stat. 456: 438.2(A), and by virtue of the fact that none of the claims submitted in connection

with its conduct were even eligible for reimbursement by the government-funded healthcare

programs.

186.    The State of Louisiana, by and through the Louisiana Medicaid program and other

state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by

healthcare providers and third party payers in connection therewith.

43

187.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Louisiana in connection with AZ's

conduct. Compliance with applicable Louisiana statutes, regulations and Pharmacy Manuals was

also an express condition of payment of claims submitted to the State of Louisiana.

188.    Had the State of Louisiana known of AZ's wrongful conduct in connection with

Nexium, it would not have paid the claims submitted by healthcare providers and third party

payers in connection with that conduct.

189.    As a result of AZ's violation of La. Rev. Stat. 46:438.3 the State of Louisiana has

been damaged in an amount far in excess of millions of dollars exclusive of interest.

190.    Relators are each private citizens with direct and independent knowledge of the

allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. 46: 439.1(A)

on behalf of himself and the State of Louisiana.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against AZ:

To the State of Louisiana:

(1)    Three times the amount of actual damages which the State of Louisiana
has sustained as a result of Defendant's conduct;

(2)    A civil penalty of up to $ 10,000 for each false claim which Defendant
caused to be presented to the State of Louisiana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A)
and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in
connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

44

(4)    Such further relief as this Court deems equitable and just.

## COUNT XV

## MICHIGAN MEDICAID FALSE CLAIMS ACT

191.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

192.    This is a *qui tam* action brought by Relator on behalf of the State of Michigan to

recover treble damages and civil penalties under the Michigan Medicaid False Claims Act. MI

ST Ch. 400.603 *et seq.*

> 400.603 provides liability in pertinent part as follows:
> Sec. 3. (1) A person shall not knowingly make or cause to be made a false
> statement or false representation of a material fact in an application for Medicaid
> benefits;
> (2)A person shall not knowingly make or cause to be made a false statement or
> false representation of a material fact for use in determining rights to a Medicaid
> benefit...

193.    In addition, MI ST Ch. 400.604 prohibits the solicitation or receipt of any

remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly,

in cash or in kind in return for furnishing any item or service for which payment may be made in

whole or in part under the Michigan Medicaid program.

194.    AZ violated MI ST Ch. 400.603 *et seq.* by engaging in the conduct described

herein.

195.    AZ furthermore violated, MI ST Ch. 400.603 *et seq.* and knowingly caused false

claims to be made, used and presented to the State of Michigan by its deliberate and systematic

violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and by virtue

of the fact that none of the claims submitted in connection with its conduct were even eligible for

reimbursement by the government-funded healthcare programs.

45

196.    The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

197.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with AZ's conduct. Compliance with applicable Michigan statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Michigan.

198.    Had the State of Michigan known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

199.    As a result of AZ's violation of MI ST Ch. 400.603 *et seq.* the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

200.    Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to MI ST Ch. 400.603 *et seq.* on behalf of himself and the State of Michigan.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the State of Michigan:

(1)    Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendant's conduct;
(2)    A civil penalty equal to the full amount received for each false claim which Defendant caused to be presented to the State of Michigan;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relators:

46

(1)     The maximum amount allowed pursuant to MI ST Ch. 400.603 *et seq.*
        and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in
        connection with this action;

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XVI

## MONTANA FALSE CLAIMS ACT

### MONT. CODE ANN. § 17-8-403(a)-(b)

201.    Relators DiMattia and Tuggle repeat and reallege by reference the allegations

contained in paragraphs 1 through 84 above as if fully set forth herein.

202.    This is a *qui tam* action brought by Relator on behalf of the State of Montana to

recover treble damages and penalties under the Montana False Claims Act, Mont. Code Ann

§ 17-8-403(l)(a)-(b)

203.    17-8-403 provides liability for any person who:

(a)     knowingly presenting or causing to be presented to an officer or employee
        of the governmental entity a false claim for payment or approval;

(b)     knowingly making, using, or causing to be made or used a false record or
        statement to get a false claim paid or approved by the governmental entity;

(c)     conspiring to defraud the governmental entity by getting false claim
        allowed or paid by the governmental entity.

(h)     as a beneficiary of an inadvertent submission of a false claim to the
        governmental entity, subsequently discovering the falsity of the claim and
        failing to disclose the false claim to the governmental entity within -a
        reasonable time after discovery of the false claim.

204.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Montana in connection with AZ's

47

conduct. Compliance with applicable Montana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Montana.

205. Had the State of Montana known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

206. The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by AZ, paid and continues to pay the claims that would not be paid but for Defendant's conduct.

207. By reason of the AZ's acts, the State of Montana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

208. The State of Montana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, by AZ.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the State of Montana:

(1) Not less than two times and not more than three times the amount of actual damages which the State of Montana has sustained as a result of Defendant's conduct;

(2) A civil penalty of up to $ 10,000 for each false claim which Defendant caused to be presented to the State of Montana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Montana Code Ann. § 17-8-403 (1)(A)-(B). and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorney's fees and costs; and

48

DM1\2339799.3

(4)     Such further relief as this Court deems equitable and just.

## COUNT XVII

### NEVADA FALSE CLAIMS ACT

209.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

210.    This is a *qui tam* action brought by Relator on behalf of the State of Nevada to

recover treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat.

§ 357.010, *et seq.*

211.    Nev. Rev. Stat. § 357.040(1) provides liability for any person who-

(a)     knowingly presents or causes to be presented a false claim for
        payment or approval;
(b)     knowingly makes or uses, or causes to be made or used, a false
        record or statement to obtain payment or approval of a false claim;
(c)     conspires to defraud by obtaining allowance or payment of a false
        claim;
        ***
(h)     is a beneficiary of an inadvertent submission of a false claim and,
        after discovering the falsity of the claim, fails to disclose the falsity
        to the state or political subdivision within a reasonable time.

212.    In addition, Nev. Rev. Stat. § 422.560 prohibits the solicitation, acceptance or

receipt of anything of value in connection with the provision of medical goods or services for

which payment may be made in whole or in part under the Nevada Medicaid program.

213.    AZ violated Nev. Rev. Stat. § 422.560 by engaging in the conduct described

herein.

214.    AZ furthermore violated Nev. Rev. Stat.§ 357.040(1) and knowingly caused false

claims to be made, used and presented to the State of Nevada by its deliberate and systematic

violation of federal and state laws, including the FCA, federal Anti-Kickback Act and Nev. Rev.

49

Stat. § 422.560, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

215.    The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, was unaware of Defendant's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

216.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with AZ's conduct. Compliance with applicable Nevada statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Nevada.

217.    Had the State of Nevada known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

218.    As a result of AZ's violation of Nev. Rev. Stat. § 357.040(1) the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

219.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Nev. Rev. Stat. § 357.080(1) on behalf of himself and the State of Nevada.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the State of Nevada:

(1)    Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendant's conduct;

50

Case 1:10-cv-00910-SLR   Document 2   Filed 10/25/10   Page 51 of 118 PageID #: 122

(2)    A civil penalty of not less than $5,000 and not more than $ 10,000 for each false claim which Defendant caused to be presented to the State of Nevada;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action..

To Relators:

(1)    The maximum amount allowed pursuant to Nev. Rev. Stat. § 357.210 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XVIII

## THE NEW HAMPSHIRE HEALTH CARE FALSE CLAIMS ACT

220.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in paragraphs 1 through 84 above as if fully set forth herein.

221.    This is a *qui tam* action brought by Relator on behalf of the State of New Hampshire to recover treble damages and civil penalties under the New Hampshire Health Care False Claims Law, N.H. Rev. Stat. Ann. §167:61-b *et seq.* provides:

1.    Any person shall be liable who...

(a)    knowingly presents, or causes to be presented, to an officer or employee of the department a false or fraudulent claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department;

(c)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid.
    ***

(f)    Is a beneficiary of an inadvertent submission of a false claim to the department, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the department within a reasonable time after discovery of the false claim.

222.    In addition, N.H. Rev. Stat. Ann. prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly,

51

in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Hampshire Medicaid program.

223.    AZ violated the N.H. Rev. Stat. Ann by engaging in the conduct described herein.

224.    AZ furthermore violated N.H. Rev. Stat. Ann. §167:61-b, and knowingly caused false claims to be made, used and presented to the State of New Hampshire by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and the New Hampshire Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

225.    The State of New Hampshire, by and through the New Hampshire Medicaid program and other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

226.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Hampshire in connection with AZ's conduct.  Compliance with applicable New Hampshire statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Hampshire.

227.    Had the State of New Hampshire known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

DM1\2339799.3

228.     As a result of AZ's violation of N.H. Rev. Stat. Ann. §167:61-b *et seq.*, the State

of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive

of interest.

229.     Relators are each private citizens with direct and independent knowledge of the

allegations of this Complaint, who have brought this action pursuant to N.H. Rev.Stat. Ann.

§167:61-b *et seq.* on behalf of himself and the State of New Hampshire.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against AZ:

To the State of New Hampshire:

(1)     Three times the amount of actual damages which the State of New
        Hampshire has sustained as a result of Defendant's conduct;
(2)     A civil penalty of not less than $5,000 and not more than $10,000 for
        each false claim which Defendant caused to be presented to the State of
        New Hampshire;
(3)     Prejudgment interest; and
(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to N.H. Rev. Stat. Ann
        § 167:61-b *et seq.* and/or any other applicable provision of law;
(2)     Reimbursement for reasonable expenses which Relators incurred in
        connection with this action;
(3)     An award of reasonable attorney's fees and costs; and
(4)     Such further relief as this Court deems equitable and just.

## COUNT XIX

### NEW JERSEY FALSE CLAIMS ACT

230.     Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

231.    This is a *qui tam* action brought by Relator on behalf of the State of New Jersey to

recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat.

§ 2A:32C-1 *et seq.* (2008) *et seq.*

232.    N.J. Stat. § 2A:32C-3 provides liability for any person who:

(a)    knowingly presents, or causes to be presented, to an employee, officer, or agent of the State or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

233.    In addition, Section 17 of P.L. 1968, c.413 (C.30:4D717) of the New Jersey False

Claims Act prohibits the solicitation, offer or receipt of any remuneration, including any

kickback, rebate or bribe in connection with the furnishing of items or services for which

payment is or may be made in whole or in part under the New Jersey Medicaid program.

234.    AZ violated Section 17 of P.L. 1968, c.413 (C.30:4D-17) by engaging in the

conduct described herein.

235.    AZ furthermore violated N.J. Stat. § 2A:32C-1 *et seq.* and knowingly caused false

claims to be made, used and presented to the State of New Jersey by its deliberate and systematic

violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and the New

Jersey False Claims Act and Kickback statute, and by virtue of the fact that none of the claims

submitted in connection with its conduct were even eligible for reimbursement by the

government-funded healthcare programs.

236.    The State of New Jersey, by and through the New Jersey Medicaid program and

other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by

healthcare providers and third party payers in connection therewith.

237.    Compliance with applicable Medicare, Medicaid and the various other federal and
state laws cited herein was an implied, and upon information and belief, also an express
condition of payment of claims submitted to the State of New Jersey in connection with AZ's
conduct.  Compliance with applicable New Jersey statutes, regulations and Pharmacy Manuals
was also an express condition of payment of claims submitted to the State of New Jersey.

238.    Had the State of New Jersey known of AZ's wrongful conduct in connection with
Nexium, it would not have paid the claims submitted by healthcare providers and third party
payers in connection with that conduct.

239.    As a result of AZ's violation of N.J. Stat. § 2A:32C-1 *et seq.*, the State of New
Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

240.    Relators are each private citizens with direct and independent knowledge of the
allegations of this Complaint, who has brought this action pursuant to N.J. Stat. § 2A:32C-1
*et seq.* on behalf of himself and the State of New Jersey.

WHEREFORE, Relators respectfully request this Court to award the following
damages to the following parties and against AZ:

To the State of New Jersey:

(1)    Three times the amount of actual damages which the State of New Jersey
has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than and not more than the civil penalty
allowed under the federal False Claims Act (31 U.S.C. s.3729 *et seq.*)
which Defendant caused to be presented to the State of New Jersey;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to N.J. Stat. § 2A:32C-1 *et seq.*
and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relators incurred in
connection with this action;

55

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XX

## NEW MEXICO MEDICAID FALSE CLAIMS ACT AND NEW MEXICO FRAUD

## AGAINST TAXPAYERS ACT

241.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

242.    This is a *qui tam* action brought by Relator on behalf of the State of New Mexico

to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act

N.M. Stat. Ann§§ 27-14-1 *et seq.*

243.    Section 4 provides liability in pertinent part as follows:

A person ...shall be liable...if the person:

A.    presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;

B.    presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;

C.    makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

D.    conspires to defraud the state by getting a claim allowed or paid. Under the Medicaid program knowing that such claim is false or fraudulent.

244.    It is also brought by Relator on behalf of the State of New Mexico to recover

treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act N.M.

Stat. Ann § 44-9-1 *et seq.* provides liability in pertinent part as follows:

245.    § 44-9-3(A) A person shall not:

(1) knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee or other recipient of state funds a false or fraudulent claim for payment or approval;
(2) knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;
(3) conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim.

246. In addition, N.M, Stat. Ann§ § 30-44-7 *et seq.* prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Mexico Medicaid program.

247. AZ violated N.M. Stat. Ann§§ 30-44-7 et seq. by engaging in the conduct described herein.

248. AZ furthermore violated, N.M. Stat. Ann§§ 27-14-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Mexico by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

249. The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

250. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with AZ's conduct.

57

251. Compliance with applicable New Mexico statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Mexico.

252. Had the State of New Mexico known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by. healthcare providers and third party payers in connection with that conduct.

253. As a result of AZ's violation of N.M. Stat. Ann§§ 27-14-1 *et seq.* the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

254. Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.M. Stat. Ann§§ 27-14-1 *et seq.* on behalf of himself and the State of New Mexico.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the State of New Mexico:

(1) Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendant's conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New Mexico;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to N.M. Stat. Ann§§ 27-14-1 *et seq.* and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3) An award of reasonable attorney's fees and costs; and
(4) Such further relief as this Court deems equitable and just.

## COUNT XXI

## NEW YORK FALSE CLAIMS ACT

255.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

256.    This is a *qui tam* action brought by Relator on behalf of the State of New York to

recover treble damages and civil penalties under the New York False Claims Act, 2007 N. Y.

Laws 58, Section 39, Article XIII

257.    Section 189 provides liability for any person who:

> 1.(a)    knowingly presents, or causes to be presented, to any employee,
> officer or agent of the state or local government, a false or fraudulent
> claim for payment or approval;
> 1.(b)    knowingly makes, uses, or causes to be made or used, a false
> record or statement to get a false or fraudulent claim paid or approved by
> the state or local government;
> 1. (c)   conspires to defraud the State by getting a false or fraudulent claim
> allowed or paid.

258.    In addition, the New York State Consolidated Laws prohibits the solicitation or

receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly,

overtly or covertly, in cash or in kind in return for furnishing any item or service for which

payment may be made in whole or in part under the New York Medicaid program.

259.    AZ violated the New York State Consolidated Laws by engaging in the conduct

described herein.

260.    AZ furthermore violated, 2007 N.Y. Laws 58, Section 39, Article XIII, and

knowingly caused false claims to be made, used and presented to the State of New York by its

deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-

Kickback Act, and the New York Vendor Fraud and Kickback statute, and by virtue of the fact

59

that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

261. The State of New York, by and through the New York Medicaid program and other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

262. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with AZ's conduct. Compliance with applicable New York statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New York.

263. Had the State of New York known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

264. As a result of AZ's violation of 2007 N. Y. Laws 58, Section 39, Article XIII, the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

265. Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 2007 N. Y. Laws 58, Section 39, Article XIII, on behalf of himself and the State of New York.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the State of New York:

(1)     Three times the amount of actual damages which the State of New York has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $6,000 and not more than $12,000 for each false claim which Defendant caused to be presented to the State of New York;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to 2007 N. Y. Laws 58, Section 39, Article XIII, and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXII

## OKLAHOMA MEDICAID FALSE CLAIMS ACT

266.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in paragraphs 1 through 84 above as if fully set forth herein.

267.    This is a. *qui tam* action brought by Relator on behalf of the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act 63 Okl. St. §5053 (2008) *et seq.*

268.    63 Okl. St. § 5053.1 (2)(B) provides liability for any person who:

(1)    knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

(2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

269.    In addition, 56 Okl. St. § 1005 (2008) of the Oklahoma Medicaid Program Integrity Act prohibits the solicitation or receipt of any benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program.

270. AZ violated 56 Okl. St. § 1005 *et seq.* by engaging in the conduct described herein.

271. AZ furthermore violated 63 Okl. St. § 5053.1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and the Oklahoma Medicaid Program Integrity Act and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

272. The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

273. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with AZ's conduct. Compliance with applicable Oklahoma statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Oklahoma.

274. Had the State of Oklahoma known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

275. As a result of AZ's violation of 63 Okl. St. § 5053.1 *et seq.*, the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

DM1\2339799.3

276.    Relators are each private citizens with direct and independent knowledge of the

allegations of this Complaint, who has brought this action pursuant to 63 Okl. St. § 5053.1 *et seq.*

on behalf of himself and the State of Oklahoma.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against AZ:

To the State of Oklahoma:

(1)    Three times the amount of actual damages which the State of Oklahoma
        has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5,000 and not more than $10,000 for
        each false claim which Defendant caused to be presented to the State of
        Oklahoma;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to 63 Okl. St. § 5053.1 *et seq.*
        and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relators incurred in
        connection with this action;
(3)    An award of reasonable attorney's fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT XXIII

## RHODE ISLAND STATE FALSE CLAIMS ACT

277.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

278.    This is a *qui tam* action brought by Relator on behalf of the State of Rhode Island

to recover treble damages and civil penalties under the Rhode Island State False Claims Act R.I.

Gen. Laws §9-1.1-1 (2008) *et seq.*

279.    R.I. Gen. Laws § 9-1.1-3 provides liability for any person who:

63

       (1)     knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;

       (2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

       (3)     conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

280.     In addition, R.I. Gen. Laws § 40-8.2-3(2)(i) prohibits the solicitation, receipt, offer or payment of any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Rhode Island Medicaid program.

281.     AZ violated R.I. Gen. Laws § 40-8.2-3 *et seq.* by engaging in the conduct described herein.

282.     AZ furthermore violated R.I. Gen. Laws § 9-1.1-1 and knowingly caused false claims to be made, used and presented to the State of Rhode Island by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and the Rhode Island General Laws and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

283.     The State of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

284.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with AZ's

conduct. Compliance with applicable Rhode Island statutes, regulations and Pharmacy Manuals
was also an express condition of payment of claims submitted to the State of Rhode Island.

285.    Had the State of Rhode Island known of AZ's wrongful conduct in connection
with Nexium, it would not have paid the claims submitted by healthcare providers and third party
payers in connection with that conduct.

286.    As a result of AZ's violation of R.I. Gen. Laws §9-1.1-1, the State of Rhode
Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

287.    Relators are each private citizens with direct and independent knowledge of the
allegations of this Complaint, who has brought this action pursuant to R.I. Gen. Laws §9-1.1-1 *et
seq.* on behalf of himself and the State of Rhode Island.

WHEREFORE, Relators respectfully request this Court to award the following
damages to the following parties and against AZ:

To the State of Rhode Island:

(1)    Three times the amount of actual damages which the State of Rhode
Island has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5,000 and not more than $10,000 for
each false claim which Defendant caused to be presented to the State of
Rhode Island;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to R.I. Gen. Laws §9-1.1-4(d)
and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relators incurred in
connection with this action;
(3)    An award of reasonable attorney's fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT XXIV

### TENNESSEE FALSE CLAIMS ACT

288.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

289.    This is a *qui tam* action brought by Relator on behalf of the State of Tennessee to

recover treble damages and civil penalties under the Tennessee False Claims Act, Tenn. Code

Ann. § 4-18-101 *et seq.* and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181

*et seq.*

290.    § 4-18-103(a) provides liability for any person who-

> (1)    Knowingly presents, or causes to be presented to an officer or
> employee of the state..., a false claim for payment or approval;
> (2)    Knowingly makes, uses, or causes to be made or used, a false
> record or statement to get a false claim paid or approved by the state or by
> any political subdivision;
> (3)    Conspires to defraud the state or any political subdivision by
> getting a claim allowed or paid by the state of by any political subdivision.

> § 71-5-182(a)(1) provides liability for any person who-

> (A)    presents, or causes to be presented to the state, a claim for payment
> under the Medicaid program knowing such claim is false or fraudulent;
> (B)    makes or uses, or causes to be made or used, a record or statement
> to get a false or fraudulent claim under the Medicaid program paid for or
> approved by the state knowing such record or statement is false;
> (C)    conspires to defraud the State by getting a claim allowed or paid
> under the Medicaid program knowing such claim is false or fraudulent.

291.    AZ violated Tenn. Code Ann. § 4-18-103(a) and § 71-5-1 82(a)(1) and knowingly

caused false claims to be made, used and presented to the State of Tennessee by its deliberate

and systematic violation of federal and state laws, including the FCA and Anti-Kickback Act,

and by virtue of the fact that none of the claims submitted in connection with its conduct were

even eligible for reimbursement by the government-funded healthcare programs.

66

292.     The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

293.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with AZ's conduct. Compliance with applicable Tennessee statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Tennessee.

294.     Had the State of Tennessee known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

295.     As a result of AZ's violation of Term. Code Ann. § 4-18-103(a) and § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

296.     Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 4-18 -103 (a) and § 71-5-183(a)(l) on behalf of himself and the State of Tennessee.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the State of Tennessee:

(1)     Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $2,500 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Tennessee;

(3)     Prejudgment interest; and

67

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Tenn. Code Ann. § 71 -5-183 (c) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXV

## TEXAS MEDICAID FRAUD PREVENTION LAW

297.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

298.    This is a *qui tam* action brought by Relator on behalf of the State of Texas to

recover double damages and civil penalties under Tex. Hum. Res. Code § 36.001 *et seq.*

299.    Tex. Hum. Res. Code § 36.002 provides liability for any person who-

(1)    knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

(a)    on an application for a contract, benefit, or payment under the Medicaid program; or

(b)    that is intended to be used to determine its eligibility for a benefit

(2)    knowingly or intentionally concealing or failing to disclose an event:

(A)    that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of.

(i)    the person, or

(ii)    another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and

(B)    to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;
***

(4)    knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:
***

68

(B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5) ... knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service provided to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program.

300.   AZ violated Tex. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-kickback Act and § 36.002, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

301.   The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

302.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with AZ's conduct. Compliance with applicable Texas statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Texas.

303.   Had the State of Texas known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

304.   As a result of AZ's violation of Tex. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

69

305. AZ did not, within 30 days after it first obtained information as to such violation, furnish such information to officials of the State responsible for investigating false claims violation, did not otherwise fully cooperate with any investigation of the violation, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

306. Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tex. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the State of Texas:

(1)    Two times the amount of actual damages which the State of Texas has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5,000 or more than $ 15,000 pursuant to Tex. Hum.. Res. Code § 36.025(a)(3) for each false claim which Defendant cause to be presented to the state of Texas;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Tex. Hum. Res. Code §36.110, and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3)    An award of reasonable attorney's fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT XXVI

## WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT

307. Relators DiMattia and Tuggle repeat and reallege each allegation contained in paragraphs 1 through 84 above as if fully set forth herein.

70

308.     This is a *qui tam* action brought by Relator on behalf of the State of Wisconsin to

recover treble damages and civil penalties under the Wisconsin False Claims for Medical

Assistance Law, Wis. Stat. § 20.931 *et seq.*

     309.     Wis. Stat. § 20.931 (2) provides liability for any person who:

          (a)     Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.

          (b)     Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.

          (c)     conspires to defraud this State by obtaining allowance or payment of claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance Program;
              ***

          (g)     knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance Program.

     310.     In addition, Wis. Stat. § 49.49(2) of the Wisconsin Public Assistance Code

prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate,

directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or

service for which payment may be made in whole or in part under the Wisconsin Medicaid

program.

     311.     AZ violated Wis. Stat. § 49.49(2) by engaging in the conduct described herein.

     312.     AZ furthermore violated Wis. Stat. § 20.931 *et seq.* and knowingly caused false

claims to be made, used and presented to the State of Wisconsin by its deliberate and systematic

violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and the

Wisconsin Public Assistance Code and Kickback statute, and by virtue of the fact that none of

the claims submitted in connection with its conduct were even eligible for reimbursement by the

government-funded healthcare programs.

313.     The State of Wisconsin, by and through the Wisconsin Medicaid program and other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

314.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Wisconsin in connection with AZ's conduct. Compliance with applicable Wisconsin statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Wisconsin.

315.     Had the State of Wisconsin known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

316.     As a result of AZ's violation of Wis. Stat. § 20.931 *et seq.* , the State of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

317.     Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Wis. Stat. § 20.931 *et seq.* on behalf of himself and the State of Wisconsin.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the State of Wisconsin:

(1)     Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Defendant's conduct;
(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Wisconsin;
(3)     Prejudgment interest; and
(4)     All costs incurred in bringing this action.

72

To Relators:

(1)     The maximum amount allowed pursuant to Wis. Stat. § 20.931 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXVII

## MASSACHUSETTS FALSE CLAIMS ACT

318.     Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

319.     This is a *qui tam* action brought by Relator on behalf of the Commonwealth of

Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass.

Gen. Laws Chap. 12 § 5(A) *et seq.*

320.     Mass. Gen. Laws Chap. 12 § 5B provides liability for any person who-

(1)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or

(3)     conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;
***

(9)     is a beneficiary of an inadvertent submission of a false claim . to the commonwealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim shall be liable to the commonwealth or political subdivision.

321.     In addition, Mass. Gen. Laws Chap. 118E § 41 prohibits the solicitation, receipt

or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or

covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

322.   AZ violated Mass. Gen. Laws Chap. 118E § 41 by engaging in the conduct described herein.

323.   AZ furthermore violated Mass. Gen. Laws Chap. 12 § 5B and knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, Mass. Gen. Law Chap. 118E § 41 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

324.   The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

325.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief: also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with AZ's conduct.   Compliance with applicable Massachusetts statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Massachusetts.

326.   Had the Commonwealth of Massachusetts known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

327.    As a result of AZ's violation of Mass. Gen. Laws Chap. 12 § 5B, the

Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of

dollars exclusive of interest.

328.    Relators are each private citizens with direct and independent knowledge of the

allegations of this Complaint, who has brought this action pursuant to Mass. Gen. Laws Chap. 12

§ 5(c)(2) on behalf of himself and the Commonwealth of Massachusetts.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against AZ:

To the Commonwealth of Massachusetts:

(1)    Three times the amount of actual damages which the Commonwealth of
       Massachusetts has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5,000 and not more than $10,000 for
       each false claim which Defendant caused to be presented to the
       Commonwealth of Massachusetts;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Mass. Gen. Laws Chap. 12,
       §5F and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relators incurred in
       connection with this action;
(3)    An award of reasonable attorney's fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT XXVIII

## VIRGINIA FRAUD AGAINST TAXPAYERS ACT

329.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

330.    This is a *qui tam* action brought by Relator on behalf of the Commonwealth of

Virginia for treble damages and penalties under Va. Code Ann. § 8.01-216.3a provides liability

for any person who:

> 1.    Knowingly presents, or causes to be presented, to an officer or
> employee of the Commonwealth a false or fraudulent claim for payment
> or approval;
> 2.    Knowingly makes, uses, or causes to be made or used, a false
> record or statement to get a false or fraudulent claim paid or approved by
> the Commonwealth;
> 3.    Conspires to defraud the Commonwealth by getting a false or
> fraudulent claim allowed or paid.

331.    In addition, Va. Code Ann. § 32.1 -315 prohibits the solicitation, receipt or

offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or

covertly, in cash or in kind in return for furnishing any good, service or item for which payment

may be made in whole or in part under the Virginia Medicaid program.

332.    AZ violated Va. Code Ann. §32.1-315 by engaging in the conduct described

herein.

333.    AZ furthermore violated Va. Code Ann. §§8.01-216.3a and knowingly caused

false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate

and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback

Act, VA Code Ann. §32.1-315 and by virtue of the fact that none of the claims submitted in

connection with its conduct were even eligible for reimbursement by the government-funded

healthcare programs.

334.    The Commonwealth of Virginia, by and through the Virginia Medicaid program

and other state healthcare programs, was unaware of AZ's conduct and paid the claims submitted

by healthcare providers and third party payers in connection therewith.

76

335. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with AZ's conduct. Compliance with applicable Virginia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

336. Had the Commonwealth of Virginia known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

337. As a result of AZ's violation of Va. Code Ann. §8.01-216.3(a), the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

338. Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Va. Code Ann. § 8.01-216.5 on behalf of himself and the Commonwealth of Virginia.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the Commonwealth of Virginia:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant's conduct;
(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the Commonwealth of Virginia;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in
connection with this action;

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXIX

## DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT

339.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

340.    This is a *qui tam* action brought by Relator and the District of Columbia to

recover treble damages and civil penalties under the District of Columbia Procurement Reform

Amendment Act, D.C. Code § 2-308.13 *et seq.*

341.    D.C. Code § 2-308.14(a) provides liability for any person who-

(1)     knowingly presents, or causes to be presented, to an officer or
employee of the District a false claim for payment or approval;
(2)     knowingly makes, uses, or causes to: be made or used, a false
record or statement to get a false claim paid or approved by the District;
(3)     conspires to defraud the District by getting a false claim allowed or
paid by the District;
***

(8) is the beneficiary of an inadvertent submission of a false claim to the
District, subsequently discovers the falsity of the claim, and fails to
disclose the false claim to the District.

342.    In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to

accept any type of remuneration for the following:

(1)     Referring a recipient to a particular provider of any item or service
or for which payment may be made under the District of Columbia
Medicaid program, or

(2)     Recommending the purchase, lease, or order of any good, facility,
service, or item for which payment may be made under the District
of Columbia Medicaid Program.

343.    AZ violated D.C. Code § 4-802(c) by engaging in the illegal conduct described

herein.  AZ furthermore violated D.C. Code § 2-308.14(a) and knowingly caused thousands of

false claims to be made, used and presented to the District of Columbia by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act D.C. Code § 4-802(c), and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the government-funded healthcare programs.

344.    The District of Columbia, by and through the District of Columbia Medicaid program and other state healthcare programs, was unaware of AZ's illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

345.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the District of Columbia in connection with AZ's illegal conduct. Compliance with applicable D.C. statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the District of Columbia.

346.    Had the District of Columbia known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

347.    As a result of AZ's violation of D.C. Code § 2-308,14(a) the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

348.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

79

To the District of Columbia:

(1)   Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendant's illegal conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the District of Columbia;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)   An award of reasonable attorney's fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## COUNT XXX

### CONNECTICUT FALSE CLAIMS ACT

349.   Relators DiMattia and Tuggle repeat and reallege each allegation contained in paragraphs 1 through 84 above as if fully set forth herein.

350.   This is a *qui tam* action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut Medical Assistance Program False Claims Act, § 17b-301a *et. seq.* (the "Act").

351.   The Act provides liability for any person who (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval under the medical assistance programs administered by the Department of Social Services; (2) knowingly makes, uses or causes to be made or used a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under medical assistance programs administered by the Department of Social Services; (3) conspires to defraud the state by securing the allowance or

80

payment of a false or fraudulent claim under medical assistance programs administered by the Department of Social Services.

352. AZ violated Conn. Code § 17b-301b by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

353. In addition, Conn. Code § 53a-161d, prohibits knowingly offering or paying any benefit with intent to influence such person for the furnishing of any goods, facilities or services for which a claim for benefits or reimbursement has been filed with a local state or federal agency.

354. AZ violated Conn. Code § 53a-161d by engaging in the conduct described herein.

355. AZ furthermore violated Conn. Code § 17b-301b and knowingly caused false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, Conn. Code § 53a-161d and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs

356. Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, was unaware of AZ's illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

357. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Connecticut in connection with AZ's illegal conduct. Compliance with applicable Connecticut statutes, regulations and Pharmacy Manuals was also an express condition for payment of claims submitted to Connecticut.

81

358.    Had the State of Connecticut known of AZ's wrongful conduct in connection with

Nexium, it would not have paid the claims submitted by healthcare providers and third party

payers in connection with that conduct.

359.    As a result of AZ's violation of Conn. Code § 17b-301b, Connecticut has been

damaged in an amount far in excess of millions of dollars exclusive of interest.

360.    Relator are each private citizens with direct and independent knowledge of the

allegations in this Complaint, who has brought this action pursuant to Connecticut Code § 17b-

301d on behalf of himself and the State of Connecticut.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against AZ:

To Connecticut:

(1)    Three times the amount of actual damages which Connecticut has
sustained as a result of Defendant's illegal conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for
each false claim which Defendant caused to be presented to Connecticut;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Conn. Code § 17b-301e
and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in
connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXXI

## MINNESOTA FALSE CLAIMS ACT

361.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

82

362.    This is a *qui tam* action brought by Relator and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, § 15C.01 *et seq.* (the "Act").

363.    The Act provides liability for any person who (1) knowingly presents or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval; (2) knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision; (3) knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim.

364.    AZ violated Minnesota Statute § 15C.02 by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

365.    In addition, Minnesota Statute § 62J.23 provides that the restrictions in the federal Medicare anti-kickback statutes apply to all persons in the state.

366.    AZ furthermore violated Minn Stat. § 15C.02 and knowingly caused false claims to be made, used and presented to the State of Minnesota by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, Minn. Stat. § 15C.02 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs

367.    Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, was unaware of AZ's illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

83

368.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to Minnesota in connection with AZ's illegal conduct.

Compliance with applicable Minnesota statutes, regulations and Pharmacy Manuals was also an

express condition of payment of claims submitted to Minnesota.

369.    Had the State of Minnesota known of AZ's wrongful conduct in connection with

Nexium, it would not have paid the claims submitted by healthcare providers and third party

payers in connection with that conduct.

370.    As a result of AZ's violation of Minn. Stat. § 15C.02, Minnesota has been

damaged in an amount far in excess of millions of dollars exclusive of interest.

371.    Relator are each private citizens with direct and independent knowledge of the

allegations of this Complaint, who has brought this action pursuant to Minn. Stat § 15C.05 on

behalf of himself and the State of Minnesota.

        WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against AZ:

        To Minnesota:

        (1)    Three times the amount of actual damages which Minnesota has
               sustained as a result of Defendant's illegal conduct;
        (2)    A civil penalty of not less than $5,500 and not more than $11,000 for
               each false claim which Defendant caused to be presented to Connecticut;
        (3)    Prejudgment interest; and
        (4)    All costs incurred in bringing this action.

        To Relators:

        (1)    The maximum amount allowed pursuant to Minn. Stat. § 15C.13 and/or
               any other applicable provision of law;
        (2)    Reimbursement for reasonable expenses which Relators incurred in
               connection with this action;

84

    (3)    An award of reasonable attorney's fees and costs; and

    (4)    Such further relief as this Court deems equitable and just

### COUNT XXXII

### CHICAGO FALSE CLAIMS ACT

372.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

373.    This is a *qui tam* action brought by Relator and the City of Chicago to recover

treble damages and civil penalties under the Chicago False Claims Act, § 1-22-010 *et seq.*

374.    The Municipal Code of Chicago § 1-22-020 provides liability for any person who-

    (a)    knowingly presents, or causes to be presented, to an officer or employee of the City a false or fraudulent claim for payment or approval;

    (b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the City;

    (c)    conspires to defraud the City by getting a false or fraudulent claim allowed or paid by the City.

375.    AZ violated the Municipal Code of Chicago § 1-22-020 and knowingly caused

thousands of false claims to be made, used and presented to the City of Chicago by its deliberate

and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback

Act, Municipal Code of Chicago § 1-22-020, and by virtue of the fact that none of the claims

submitted in connection with its illegal conduct were even eligible for reimbursement by the

government-funded healthcare programs.

376.    The City of Chicago, unaware of AZ's illegal conduct, paid the claims submitted

by healthcare providers and third party payers in connection therewith.

377.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express

85

condition of payment of claims submitted to the City of Chicago in connection with AZ's illegal conduct. Compliance with applicable Chicago statutes and regulations was also an express condition of payment of claims submitted to the City of Chicago.

378. Had the City of Chicago known of wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

379. As a result of AZ's violation of Chicago's Municipal Code § 1-22-020, the City of Chicago has been damaged in an amount far in excess of millions of dollars exclusive of interest.

380. Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Municipal Code of Chicago § 1-22-030 on behalf of himself and the City of Chicago.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To the City of Chicago:

(a) Three times the amount of actual damages which the City of Chicago has sustained as a result of Defendant's illegal conduct;

(b) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the City of Chicago;

(c) Prejudgment interest; and

(d) All costs incurred in bringing this action.

To Relators:

(a) The maximum amount allowed pursuant to the Municipal Code of Chicago § 1-22-030(d) and/or any other applicable provision of law;

(b) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(c) An award of reasonable attorneys' fees and costs; and

(d) Such further relief as this Court deems equitable-and just.

## COUNT XXXIII

## NEW YORK CITY FALSE CLAIMS ACT

381.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

382.    This is a *qui tam* action brought by Relator and the City of New York to recover

treble damages and civil penalties under the New York City False Claims Act, N.Y.

Administrative Code § 7-801 *et seq.*

383.    N.Y. Administrative Code § 7-803 provides liability for any person who-

(a)    knowingly presents, or causes to be presented, to any City officer or
employee a false claim for payment or approval by the City;

(b)    knowingly makes, uses, or causes to be made or used, a false record or
statement to get a false claim paid or approved by the City;

(c)    conspires to defraud the City by getting a false claim allowed or paid by
the City.

384.    AZ violated N.Y. Administrative Code § 7-803 and knowingly caused thousands

of false claims to be made, used and presented to the City of New York by its deliberate and

systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act,

N.Y. Administrative Code § 7-803, and by virtue of the fact that none of the claims submitted in

connection with its illegal conduct were even eligible for reimbursement by the government-

funded healthcare programs.

385.    The City of New York, unaware of AZ's illegal conduct, paid the claims

submitted by healthcare providers and third party payers in connection therewith.

386.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the City of New York in connection with AZ's

87

illegal conduct. Compliance with applicable New York statutes and regulations was also an

express condition of payment of claims submitted to the City of New York.

387.    Had the City of New York known of AZ's wrongful conduct in connection with

Nexium, it would not have paid the claims submitted by healthcare providers and third party

payers in connection with that conduct.

388.    As a result of AZ's violation of N.Y. Administrative Code § 7-803, the City of

New York has been damaged in an amount far in excess of millions of dollars exclusive of

interest.

389.    Relators are each private citizens with direct and independent knowledge of the

allegations of this Complaint, who has brought this action pursuant to N.Y. Administrative Code

§ 7-804 on behalf of himself and the City of New York.

    WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against AZ:

    To the City of New York:

    (a)    Three times the amount of actual damages which the City of New York
           has sustained as a result of Defendant's illegal conduct;
    (b)    A civil penalty of not less than $5,000 and not more than $15,000 for each
           false claim which Defendant caused to be presented to the City of New
           York;
    (c)    Prejudgment interest; and
    (d)    All costs incurred in bringing this action.

    To Relators:

    (a)    The maximum amount allowed pursuant to N.Y. Administrative Code § 7-
           804 and/or any other applicable provision of law;
    (b)    Reimbursement for reasonable expenses which Relators incurred in
           connection with this action;
    (c)    An award of reasonable attorneys' fees and costs; and
    (d)    Such further relief as this Court

88

## COUNT XXXIV

## NORTH CAROLINA FALSE CLAIMS ACT

390.     Relators DiMattia and Tuggle repeat and reallege each allegation contained in paragraphs 1 through 84 above as if fully set forth herein.

391.     This is a qui tam action brought by Relator and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.* (the "Act").

392.     The Act provides liability for any person who (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; (2) knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspires to violate subdivisions (1) or (2) of Section 1-607.

393.     AZ violated N. C. Gen.  Stat. § 1-607 by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

394.     In addition N.C. Gen. Stat. § 90-401 provides that no health care provider who refers a patient of that provider to another health care provider shall receive financial or other compensation from the health care provider receiving the referral as a payment solely or primarily for the referral.

395.     AZ violated N.C. Gen. Stat. § 90-401 by engaging in the conduct described herein.

396.     AZ furthermore violated N. C. Gen. Stat. § 1-607 and knowingly caused false claims to be made, used and presented to the State of North Carolina by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, N.

89

C. Gen. Stat. § 1-607, N.C. Gen. Stat. § 90-401 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs

397.    North Carolina, by and through the North Carolina  Medicaid program and other state healthcare programs, was unaware of AZ's illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

398.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to North Carolina in connection with AZ's illegal conduct.  Compliance with applicable North Carolina statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to North Carolina.

399.    Had the State of North Carolina known of wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

400.    As a result of AZ's violation of North Carolina Gen. Stat. §1-607, North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

401.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N. C. Gen. Stat § 1-607 on behalf of himself and the State of North Carolina.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To North Carolina:

(a)     Three times the amount of actual damages which North Carolina has sustained as a result of Defendant's illegal conduct;

(b)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to North Carolina;

(c)     Prejudgment interest; and

(d)     All costs incurred in bringing this action.

To Relators:

(a)     The maximum amount allowed pursuant to N. C. Gen. Stat. § 1-610 and/or any other applicable provision of law;

(b)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(c)     An award of reasonable attorney's fees and costs; and

(d)     Such further relief as this Court deems equitable and just

## COUNT XXXV

### COLORADO MEDICAID FALSE CLAIMS ACT

402.     Relators DiMattia and Tuggle repeat and reallege each allegation contained in paragraphs 1 through 84 above as if fully set forth herein.

403.     This is a qui tam action brought by Relator and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, C.R. S. § 25.5-4-304 et. seq. (the "Act").

404.     The Act provides liability for any person who (1) knowingly presents or causes to be presented to an officer or employee of the state a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; (3) conspires to commit a violation of paragraphs (a) or (b) of the CRS §25.5-4-305.

91

405.    AZ violated CRS §25.5-4-305 by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

406.    In addition, CRS § 25.5-4-305 makes it illegal to offer, solicit, receive or pay any remuneration, including any kickback or bribe or rebate, directly or indirectly, overtly or covertly in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment is to be made by the Colorado Medicaid or other health care funds.

407.    AZ violated  CRS § 25.5-4-305 by engaging in the illegal conduct described herein.

408.    AZ furthermore violated CRS § §25.5-4-305 and knowingly caused false claims to be made, used and presented to the State of Colorado by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs

409.    Colorado, by and through the Colorado Medicaid program and other state healthcare programs, was unaware of AZ's illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

410.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Colorado in connection with AZ's illegal conduct. Compliance with applicable Colorado statutes, regulations and Pharmacy Manuals was also an express condition for payment of claims submitted to Colorado.

411.    Had the State of Colorado known of AZ's wrongful conduct in connection with

Nexium, it would not have paid the claims submitted by healthcare providers and third party

payers in connection with that conduct.

412.    As a result of AZ's violation of CRS § §25.5-4-305, Colorado has been damaged

in an amount far in excess of millions of dollars exclusive of interest.

413.    Relators are each private citizens with direct and independent knowledge of the

allegations in this Complaint, who has brought this action pursuant to CRS §25.5-4-306 on

behalf of himself and the State of Colorado.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against AZ:

To Colorado:

(a)    Three times the amount of actual damages which Colorado has sustained
as a result of Defendant's illegal conduct;
(b)    A civil penalty of not less than $5,000 and not more than $10,000 for each
false claim which Defendant caused to be presented to Connecticut;
(c)    Prejudgment interest; and
(d)    All costs incurred in bringing this action.

To Relators:

(a)    The maximum amount allowed pursuant to CRS § 25.5-4-306 and/or any
other applicable provision of law;
(b)    Reimbursement for reasonable expenses which Relators incurred in
connection with this action;
(c)    An award of reasonable attorney's fees and costs; and
(d)    Such further relief as this Court deems equitable and just.

## COUNT XXXVI

## MARYLAND FALSE HEALTH CLAIMS ACT

414.    Relators DiMattia and Tuggle repeat and reallege each allegation contained in

paragraphs 1 through 84 above as if fully set forth herein.

93

415. This is a qui tam action brought by Relator and the State of Maryland to recover treble damages and civil penalties under the Maryland False Health Claims Act, Md. Health-General Code § 2-601 *et. seq.* (the "Act").

416. The Act provides liability for any person who (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; (3) conspires to commit such a violation.

417. AZ violated Md. Health-General Code § 2-602 by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

418. In addition Md. Criminal Code § 8-511 makes it illegal to solicit, offer, make, or receive a kickback or bribe in connection with providing items or services under a State health plan or making or receiving a benefit or payment under a State health plan.

419. AZ violated Md. Criminal Code § 8-511 by engaging in the illegal conduct described herein.

420. AZ furthermore violated Md. Health-General Code § 2-602 and knowingly caused false claims to be made, used and presented to the State of Maryland by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs

421. Maryland, by and through the Maryland Medicaid program and other state healthcare programs, was unaware of AZ's illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

422.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Maryland in connection with AZ's illegal conduct. Compliance with applicable Maryland statutes, regulations and Pharmacy Manuals was also an express condition for payment of claims submitted to Maryland.

423.    Had the State of Maryland known of AZ's wrongful conduct in connection with Nexium, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

424.    As a result of AZ's violation of, Md. Health-General Code § 2-602, Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

425.    Relators are each private citizens with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Md. Health-General Code § 2-604 on behalf of himself and the State of Maryland.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against AZ:

To Maryland:

(a)    Three times the amount of actual damages which Maryland has sustained as a result of Defendant's illegal conduct;
(b)    A civil penalty of not more than $10,000 for each false claim which Defendant caused to be presented to Maryland;
(c)    Prejudgment interest; and
(d)    All costs incurred in bringing this action.

To Relators:

(a)    The maximum amount allowed pursuant to Md. Health-General Code § 2-605 and/or any other applicable provision of law;
(b)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(c)    An award of reasonable attorney's fees and costs; and
(d)    Such further relief as this Court deems equitable and just.

95

## COUNT XXXVII

## RETALIATION AND VIOLATION OF DELAWARE
## FALSE CLAIMS AND REPORTING ACT § 1208

426.    Relator Tuggle repeats and realleges paragraphs 1 through 84 of this Complaint as if fully set forth herein.

427.    At all times material hereto, AZ was an employer covered by 6 Del. C. §1208. Section 1208 precludes discharge, demotion, suspension or discrimination against employees who investigate, provide testimony or assistance in any action filed or to be filed under the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.*.

428.    Relator Tuggle's discharge as set forth above was in violation of 6 Del. C. § 1208.

429.    As a direct and proximate result of the retaliation, harassment, threats and discharge by AZ, Relator Tuggle suffered and incurred and continues to suffer and incur substantial loss of past and future earnings; compensation and other benefits and monies; harm and damage to Relator's professional reputation and credibility by being wrongfully discharged in violation of public policy and with the false implication and statements to employees, prospective employers and others in the community that Relator Tuggle was terminated for reasons unrelated to the aforementioned refusal to acquiesce and the potential to disclose, AZ's illegal and fraudulent conduct as set forth herein.

430.    AZ's conduct was malicious, fraudulent and oppressive and in violation of public policy and a violation of 6 Del. C. § 1208.

WHEREFORE, Relator Tuggle requests that judgment be entered against Defendant in his favor and that he be awarded any and all relief pursuant to 6 Del. C. § 1208 including, but not limited to:

DM1\2339799.3

g.     Two times the amount of back pay;

h.     Interest on back pay;

i.     Any and all other compensatory and special damages;

j.     All litigation and reasonable attorney's fees;

k.     Punitive damages; and

l.     Any such further relief that this Court deems appropriate.


DUANE MORRIS LLP

By:  /s/ Gary W. Lipkin
     Gary W. Lipkin (#4044)
     Katherine V. Jackson  (#4800)
     1100 North Market Street
     Suite 1200
     Wilmington, DE  19801-1246
     (302) 657-4900
     E-Mail:  gwlipkin@duanemorris.com
     E-Mail:  kvjackson@duanemorris.com


     Michael M. Mustokoff, Esquire
     (*pro hac vice admission to be filed)*
     Mark Lipowicz, Esquire
     (*pro hac vice admission to be filed)*
     Teresa N. Cavenagh, Esquire
     (*pro hac vice admission to be filed*)
     30 South 17th Street
     Philadelphia, PA  19103
     (215) 979-1808


     Attorneys for Plaintiffs/Relators

CONFIDENTIAL

# Proposed Terms and Value: Plendil, Prilosec and Toprol XL

**Proposed Terms**

- Plendil: Purchase discount on mail volume of 38% with 2% discount for cash purchase (eff. 1/1/08)
- Prilosec: Purchase discount on mail volume of 45% with 2% discount for cash purchase (eff. 1/1/08)
- Toprol XL: Purchase discount of 87% (eff. 10/1/07)

**Value Projections**

| | Average Monthly Sales (2007, $MM) | Rebate % | | Incremental Value ($MM) | | |
| | | Current | Proposed | Per Month | Per Quarter | Per Year |
|---|---|---|---|---|---|---|
| Plendil | $1.4 | 0% | 40% | $0.6 | $1.7 | $6.7 |
| Prilosec 40mg | $2.1 | 0% | 47% | $1.0 | $3.0 | $11.8 |
| Toprol XL | $20.0 | 77% | 87% | $2.0 | $6.0 | $24.0 |
| **TOTAL** | **$23.5** | **66%** | **81%** | **$3.5** | **$10.6** | **$42.6** |

0

CONFIDENTIAL

# Proposed Terms and Value: Nexium

## Proposed Terms (Effective 1/1/08 until 12/31/10)

- FCR utilization will earn additional base rebate of 9% in mail and 10% in retail
  - Total mail rebate would equal 60% (including purchase discount); total retail rebate will equal 56%
- Non-FCR remain the same (existing contract rates)

### Value Projections

| | | Projected 2007 Sales ($MM) | Rebate % | | Incremental Value Per Year ($MM) |
| --- | --- | --- | --- | --- | --- |
| | | | Current | Proposed | |
| FCR | Retail | $139 | 46% | **56%** | $14 |
| | Mail | $309 | 51%* | **60%*** | $28 |
| Non-FCR | Retail | $400 | 46% | **46%** | - |
| | Mail | $509 | 51%* | **51%*** | - |
| **TOTAL** | | $1,357 | | | **$42** |

\* Includes 5% purchase discount

*Each 1% shift of business to FCR results in an additional $1.5MM in value for Medco*

1

CONFIDENTIAL

# Total Value – All AZ Brands

|  | 2007 | 2008 | TOTAL |
|---|---|---|---|
| Plendil | - | $7 | $7 |
| Prilosec 40mg | - | $12 | $12 |
| Toprol XL | $5 | $24 | $29 |
| Nexium | - | $42 | $42 |
| **TOTAL** | **$5** | **$85** | **$90** |

2

# Astra Zeneca Proposal Term Sheet

**Toprol XL**    Increase purchase discount on all strengths to 87%, effective 10/1/07

**Plendil**    Purchase discount on all mail volume of 38% with an additional 2% discount for cash purchase, effective 1/1/08

**Prilosec**    Purchase discount on all mail volume of 45% with an additional 2% discount for cash purchase, effective 1/1/08

**Nexium**    Effective 1/1/2008 through 12/31/2010

Non-FCR utilization will continue to earn the same rebates they earn today

Non-FCR utilization will be subject to a market share penalty,    Non-FCR utilization will be subject to a rebate penalty if
to be measured in aggregate, based on the tiers below    Medco Nexium volume does not exceed $1.5B in any given year
MS > NMS + 8% = no penalty
MS > NMS + 7% = 1% reduction
MS > NMS + 6% = 2% reduction    **OR**    Penalty tiers if below to be determined
MS > NMS + 5% = 3% reduction
MS > NMS + 4% = 4% reduction
MS > NMS + 3% = 5% reduction

FCR utilization will earn additional incentive rebates of 9% at mail and 10% at retail
Total mail rebate would equal 60% (including 5% purchase discount) ; Total retail rebate would equal 56%

FCR utilization at retail can earn an additional 4% rebate if, measured year over year, Nexium FCR increases by more than
x% in 2008; increase to be determined

All mail volume will earn an additional 4% purchase discount

The Federal Employees Program will be eligible to earn the FCR utilization rebates, however, this volume is not to be
included in either numerator or denominator of the year over year Nexium FCR increase percentage calculation



**PATIENT HEALTH** *first*
For Internal Use Only

# Toprol-XL @ 90%
*5 Quarters (4Q07 – 4Q08)*

| ($M/s) | Gross Sales | Discount | BP Impact | Gross Margin |
|---|---|---|---|---|
| TXL 100/200mg | $94.7 | $85.2 | ($0.6) | $3.2 |
| TXL 50mg | $80.0 | $72.0 | $0.0 | $3.2 |
| TXL 25mg | $22.5 | $20.2 | $0.0 | $0.9 |
| **TOTAL** | $197.2 | $177.5 | ($0.6) | $7.4 |

**Value to Medco**

AstraZeneca

**PATIENT HEALTH** *first*
For Internal Use Only

# Toprol-XL @ Current Deal

*5 Quarters (4Q07 – 4Q08)*

| ($M/s) | Gross Sales | Discount | BP Impact | Gross Margin |
|---|---|---|---|---|
| TXL 100/200mg - 80% | $94.7 | $75.8 | $0.0 | $12.3 |
| TXL 50mg - 75% | $80.0 | $60.0 | $0.0 | $14.0 |
| TXL 25mg - 75% | $22.5 | $16.9 | $0.0 | $3.9 |
| **TOTAL** | $197.2 | $152.7 | $0.0 | $30.3 |

However...

AstraZeneca 



**PATIENT HEALTH** *first*
For Internal Use Only

# Toprol-XL @ Current Offer

*1 Quarter (4Q07)*

| ($Ms) | Gross Sales | Discount | BP Impact | Gross Margin |
|---|---|---|---|---|
| TXL 100/200mg - 80% | $18.9 | $15.2 | $0.0 | $2.5 |
| TXL 50mg - 75% | $16.0 | $12.0 | $0.0 | $2.8 |
| TXL 25mg - 75% | $4.5 | $3.4 | $0.0 | $0.8 |
| **TOTAL** | **$39.4** | **$30.5** | **$0.0** | **$6.1** |

This analysis illustrates that if we don't offer Medco 90%, the Current Deal (100/200mg @ 80% & 25/50mg @75%) would only last one quarter (4Q07; based on discussions with Medco)

AstraZeneca



**PATIENT HEALTH** *first*
For Internal Use Only

# 90% vs Current Deal (1 Qtr only)

| ($Ms) | Discount @ 90% | Discount @ Current Discount | Incremental Discounts |
|---|---|---|---|
| TXL 100/200mg | $17.0 | $15.2 | $1.9 |
| TXL 50mg | $14.4 | $12.0 | $2.4 |
| TXL 25mg | $4.0 | $3.4 | $0.7 |
| TOTAL | $35.5 | $30.5 | $5.0 |

Value to Medco

AstraZeneca



PATIENT HEALTH *first*
For Internal Use Only

# Prilosec 40mg @ 55%
### *4 Quarters (1Q08 – 4Q08)*

($Ms)

| <u>Gross Sales</u> | <u>Discount</u> | <u>BP Impact</u> | <u>Gross Margin</u> |
|---|---|---|---|
| $21.6 | $12.1 | ($0.2) | $4.4 |

Incremental Value
to Medco

Current situation – no contract with Medco Mail

AstraZeneca

**PATIENT HEALTH** *first*
For Internal Use Only

# Plendil @ 48%

*4 Quarters (1Q08 – 4Q08)*

($Ms)

| Gross Sales | Discount | BP Impact | Gross Margin |
|---|---|---|---|
| $16.8 | $8.2 | ($0.1) | $6.9 |

Incremental Value
to Medco

Current situation – no contract with Medco Mail & no sales

AstraZeneca

**4 Quarters (1Q08 - 2Q08)**
*($Ms)*

| | Gross Sales | Discount | BP Impact | Gross Margin |
|---|---|---|---|---|
| Prilosec 40mg @ 55% | $21.6 | $12.1 | ($0.2) | $4.4 |

**4 Quarters (1Q08 - 2Q08)**
*($Ms)*

| | Gross Sales | Discount | BP Impact | Gross Margin |
|---|---|---|---|---|
| Plendil @ 48% | $16.8 | $8.2 | ($0.1) | $6.9 |

**Incremental Discounts to Medco**

**4 Quarters (1Q08 - 2Q08)**
*($Ms)*

| | Proposed | Current | Incremental |
|---|---|---|---|
| Prilosec 40mg @ 55% | $12.1 | $0.0 | $12.1 |
| Plendil @ 48% | $8.2 | $0.0 | $8.2 |
| **TOTAL** | $20.3 | $0.0 | $20.3 |

## MEDCO MAIL ORDER PURCHASE DISCOUNT
## Prilosec 40mg & Plendil

$M's

| PROPOSED DEAL | PRILOSEC | PLENDIL | Total Contract |
|---|---|---|---|
| TOTAL GROSS SALES | $21.6 | $16.8 | $38.4 |
| TOTAL DISCOUNTS $ | ($12.1) | ($8.2) | ($20.3) |
| TOTAL NET SALES | $9.5 | $8.6 | **$18.1** |
| TOTAL VSE/COGS | ($1.7) | ($1.5) | ($3.1) |
| TOTAL PROMPT PAY 2% | ($0.2) | ($0.2) | ($0.4) |
| TOTAL MERCK ROYALTY | ($3.0) | $0.0 | ($3.0) |
| BEST PRICE IMPACT | ($0.2) | ($0.1) | ($0.3) |
| **TOTAL GROSS MARGIN** | **$4.4** | **$6.9** | **$11.3** |

| NO DEAL | PRILOSEC | PLENDIL | Total Contract |
|---|---|---|---|
| TOTAL GROSS SALES | $6.4 | $0.0 | $6.4 |
| TOTAL DISCOUNTS $ | $0.0 | $0.0 | $0.0 |
| TOTAL NET SALES | $6.4 | $0.0 | **$6.4** |
| TOTAL VSE/COGS | ($0.5) | $0.0 | ($0.5) |
| TOTAL MERCK ROYALTY | ($2.0) | $0.0 | ($2.0) |
| **TOTAL GROSS MARGIN** | **$3.9** | **$0.0** | **$3.9** |

| GM DEAL VS CURRENT DEAL | $0.5 | $6.9 | $7.4 |
|---|---|---|---|

| BREAKEVEN DEAL | PRILOSEC | PLENDIL | Total Contract |
|---|---|---|---|
| TOTAL GROSS SALES | $7.3 | $0.0 | $7.3 |
| TOTAL DISCOUNTS $ | $0.0 | $0.0 | $0.0 |
| TOTAL NET SALES | $7.3 | $0.0 | **$7.3** |
| TOTAL VSE/COGS | ($0.6) | $0.0 | ($0.6) |
| TOTAL MERCK ROYALTY | ($2.3) | $0.0 | ($2.3) |
| **TOTAL GROSS MARGIN** | **$4.4** | **$0.0** | **$4.4** |

| GM DEAL VS BREAKEVEN | ($0.0) | $6.9 | $6.9 |
|---|---|---|---|

### NO DEAL ASSUMPTIONS
*PLENDIL - Medco is no longer purchasing, therefore, sales are $0*

### BREAKEVEN ASSUMPTIONS
*PRILOSEC - maintain 0.4% Market Share (down from current 1.2%) and maintain 35% of Gross Sales*

## PRILOSEC 40mg - MEDCO Mail Order Only Purchase Discount

**ASSUMPTIONS**

| | |
|---|---|
| Term: 1/1/08 - 12/31/08 | |
| Purchase Discount | 55.9% |
| Prompt Pay | 2.0% |

| VSE/COGS | 7.8% Gross Sales |
|---|---|
| Merck Royalty | 31.5% Net Sales |

| NMS | 2Q 2007 | 1.03% |
|---|---|---|

| | | |
|---|---|---|
| PRILOSEC MS | 2Q 2007 | 1.2% |
| GROSS SALES - QUARTER | | $5,399,549 |
| REBATE - QUARTER | | $2,537,788 |
| REBATE % - QUARTER | | 47.00% |
| NET SALES - QUARTER | | $2,861,761 |
| PLAN MARKET SIZE - QUARTER | | $457,588,908 |
| PLAN MARKET SIZE - YEAR | | $1,830,355,634 |

| PROPOSED DEAL | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 | Total Contract Period |
|---|---|---|---|---|---|
| PRILOSEC MARKET SHARE % | 1.2% | 1.2% | 1.2% | 1.2% | |
| PRILOSEC GROSS SALES | $5,399,549 | $5,399,549 | $5,399,549 | $5,399,549 | $21,598,196 |
| DISCOUNT % | 55.90% | 55.90% | 55.90% | 55.90% | 55.90% |
| DISCOUNT | ($3,018,348) | ($3,018,348) | ($3,018,348) | ($3,018,348) | ($12,073,392) |
| NET SALES | $2,381,201 | $2,381,201 | $2,381,201 | $2,381,201 | $9,524,805 |
| Prompt Pay 2% | ($47,624) | ($47,624) | ($47,624) | ($47,624) | ($190,496) |
| VSE/COGS | ($421,165) | ($421,165) | ($421,165) | ($421,165) | ($1,684,659) |
| Merck Royalty | ($750,078) | ($750,078) | ($750,078) | ($750,078) | ($3,000,313) |
| Best Price Impact | (69,865) | (66,394) | (58,473) | (53,311) | ($248,043) |
| GROSS MARGIN | $1,092,469 | $1,095,940 | $1,103,861 | $1,109,023 | $4,401,293 |

| NO DEAL | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 | Total Contract Period |
|---|---|---|---|---|---|
| PRILOSEC MARKET SHARE % | 0.4% | 0.4% | 0.4% | 0.4% | |
| PRILOSEC GROSS SALES | $1,601,561 | $1,601,561 | $1,601,561 | $1,601,561 | $6,406,245 |
| REBATE % | 0% | 0% | 0% | 0% | 0% |
| REBATE | $0 | $0 | $0 | $0 | $0 |
| NET SALES | $1,601,561 | $1,601,561 | $1,601,561 | $1,601,561 | $6,406,245 |
| VSE/COGS | ($124,922) | ($124,922) | ($124,922) | ($124,922) | ($499,687) |
| Merck Royalty | ($504,492) | ($504,492) | ($504,492) | ($504,492) | ($2,017,967) |
| GROSS MARGIN | $972,148 | $972,148 | $972,148 | $972,148 | $3,888,591 |

| GM DEAL VS CURRENT DEAL | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 | Total Contract Period |
|---|---|---|---|---|---|
| CUMULATIVE | $120,321 | $244,114 | $375,827 | $512,702 | $512,702 |

| BREAKEVEN DEAL | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 | Total Contract Period |
|---|---|---|---|---|---|
| PRILOSEC MARKET SHARE % | 0.4% | 0.4% | 0.4% | 0.4% | |
| PRILOSEC GROSS SALES | $1,799,784 | $1,805,502 | $1,818,552 | $1,827,056 | $7,250,895 |
| REBATE % | 0% | 0% | 0% | 0% | 0% |
| REBATE | $0 | $0 | $0 | $0 | $0 |
| NET SALES | $1,799,784 | $1,805,502 | $1,818,552 | $1,827,056 | $7,250,895 |
| VSE/COGS | ($140,383) | ($140,829) | ($141,847) | ($142,510) | ($565,570) |
| Merck Royalty | ($566,932) | ($568,733) | ($572,844) | ($575,523) | ($2,284,032) |
| GROSS MARGIN | $1,092,469 | $1,095,940 | $1,103,861 | $1,109,023 | $4,401,293 |

| GM DEAL VS BREAKEVEN | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 | Total Contract Period |
|---|---|---|---|---|---|
| CUMULATIVE | ($0) | ($0) | ($0) | ($0) | ($0) |

## PLENDIL - MEDCO Mail Order Only Purchase Discount

### ASSUMPTIONS

Term: 1/1/08 - 12/31/08
Purchase Discount     49.0%    Supply constraints
Prompt Pay     2.0%

| VSE/COGS | 17.0% Net Sales |
|---|---|

| NMS | 2Q 2007 | 0.00% |
|---|---|---|

| GROSS SALES - QUARTER | $4,200,000 |
|---|---|
| REBATE - QUARTER | $0 |
| REBATE % - QUARTER | 0.00% |
| NET SALES - QUARTER | $4,200,000 |

| PROPOSED DEAL | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 | Total Contract Period |
|---|---|---|---|---|---|
| PLENDIL GROSS SALES | $4,200,000 | $4,200,000 | $4,200,000 | $4,200,000 | $16,800,000 |
| DISCOUNT % | 49.04% | 49.04% | 49.04% | 49.04% | 49.04% |
| DISCOUNT | ($2,059,680) | ($2,059,680) | ($2,059,680) | ($2,059,680) | ($8,238,720) |
| NET SALES | $2,140,320 | $2,140,320 | $2,140,320 | $2,140,320 | $8,561,280 |
| Prompt Pay 2% | ($42,806) | ($42,806) | ($42,806) | ($42,806) | ($171,226) |
| VSE/COGS | ($363,854) | ($363,854) | ($363,854) | ($363,854) | ($1,455,418) |
| Best Price Impact | (16,668) | (14,816) | (20,372) | (20,002) | ($71,858) |
| GROSS MARGIN | $1,716,991 | $1,718,843 | $1,713,287 | $1,713,658 | $6,862,779 |

| NO/CURRENT DEAL | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 | Total Contract Period |
|---|---|---|---|---|---|
| PLENDIL GROSS SALES | $0 | $0 | $0 | $0 | $0 |
| REBATE % | 0% | 0% | 0% | 0% | 0% |
| REBATE | $0 | $0 | $0 | $0 | $0 |
| NET SALES | $0 | $0 | $0 | $0 | $0 |
| VSE/COGS | $0 | $0 | $0 | $0 | $0 |
| GROSS MARGIN | $0 | $0 | $0 | $0 | $0 |

| GM DEAL VS N DEAL | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 | Total Contract Period |
|---|---|---|---|---|---|
| CUMULATIVE | $1,716,991 | $3,435,834 | $5,149,122 | $6,862,779 | $6,862,779 |

## AstraZeneca Value Added Tracking Subject:

All of the below data is based on retail dispensed volume

**2007 Value: $30M**
Toprol XL - Increase PD to 60% for all strengths (last 3months of '07 and first 2months of '08)
Prilosec 40mg - 55% PD plus 2% cash discount for all of 2008

**2008 Value: $46M**
Toprol XL - Increase PD to 60% for all strengths (10months of 2008)
Plendil - 46% PD plus 2% cash discount, only apply spread to current 39% generic discount and 2% net cash discount
FEP - earn full PCR rebate on Nexium (6% base, 49% incentive, 5% PD)

| Product | Oct 07 | Nov 07 | Dec 07 | Jan 08 | Feb 08 | Mar 08 | Apr 08 | May 08 | Jun 08 | Jul 08 | Aug 08 | Sep 08 | Oct 08 | Nov 08 | Dec 08 | Total to Task |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Toprol XL 25mg & 50mg** | | | | | | | | | | | | | | | | |
| Total Value to Medco | $1,157,906 | $1,124,479 | $1,460,817 | $1,287,484 | $1,346,127 | $1,646,130 | $1,295,122 | $1,362,705 | $1,458,359 | $1,839,098 | $1,413,461 | $1,616,680 | $0 | $0 | $0 | $9,357,668 |
| Additional Value to Medco (AZ View) | $1,746,247 | $1,547,097 | $1,616,544 | $1,272,942 | $1,637,774 | $1,471,660 | $1,640,947 | $1,362,705 | $1,458,359 | $1,839,098 | $1,413,461 | $1,616,680 | $1,846,374 | $1,476,300 | $1,846,374 | $23,074,050 |
| Variance | $588,341 | $222,617 | $316,727 | ($14,542) | $291,047 | ($224,323) | $554,234 | | | | | | $1,846,374 | $1,476,300 | $1,846,374 | $14,616,903 |
| **Toprol XL 100mg & 200mg** | | | | | | | | | | | | | | | | |
| Total Value to Medco | $604,872 | $686,362 | $778,700 | $678,819 | $708,685 | $869,223 | $5,072,321 | $702,449 | $850,217 | $950,710 | $0 | $0 | $0 | $0 | $0 | $7,108,638 |
| Additional Value to Medco (AZ View) | $1,380,207 | $901,653 | $1,463,531 | $908,987 | $1,254,114 | $1,179,768 | $1,257,957 | $1,154,464 | $1,107,817 | $1,223,560 | $1,130,051 | $1,302,528 | $1,378,090 | $1,102,472 | $1,378,090 | $16,303,946 |
| Variance | $775,335 | $305,091 | $684,831 | $230,987 | $546,459 | $311,545 | $684,274 | $462,015 | $257,599 | $552,860 | $1,130,051 | $1,302,528 | $1,378,090 | $1,102,472 | $1,378,090 | $11,195,308 |
| Grand Total Value to Medco | $1,762,678 | $1,710,842 | $1,966,304 | $1,966,304 | $2,051,782 | $2,514,352 | $1,907,943 | $5,702,449 | $850,217 | $660,719 | $0 | $0 | $0 | $0 | $0 | $16,465,704 |
| Grand Additional Value to Medco (AZ View) | $3,128,454 | $2,328,550 | $3,230,076 | $2,182,620 | $2,691,288 | $2,601,598 | $3,207,041 | $2,537,259 | $2,956,175 | $3,003,545 | $2,544,412 | $2,971,308 | $3,223,464 | $2,578,771 | $3,223,464 | $42,272,005 |
| Variance | $1,363,876 | $617,708 | $1,003,658 | $216,325 | $839,506 | $87,216 | $1,230,098 | $1,834,810 | $3,715,958 | $2,402,826 | $2,544,412 | $2,971,308 | $3,223,464 | $2,578,771 | $3,223,464 | $25,812,301 |
| **Prilosec 40mg** | | | | | | | | | | | | | | | | |
| Value to Medco | $0 | $0 | $0 | $1,424,380 | $1,787,466 | $1,813,932 | $1,373,204 | $1,348,862 | $1,605,805 | $1,316,802 | $0 | $0 | $0 | $0 | $0 | $10,690,260 |
| Additional Value to Medco (AZ View) | $0 | $0 | $0 | $1,604,070 | $2,394,758 | $1,196,080 | $1,752,388 | $1,084,799 | $1,112,614 | $1,696,739 | $1,602,289 | $4,032,337 | $3,427,164 | | | $20,224,010 |
| Variance | $0 | $0 | $0 | $510,511 | $607,292 | ($616,871) | $370,053 | ($204,763) | ($513,191) | $379,037 | $1,002,289 | $4,032,337 | $3,427,164 | | | $9,533,758 |
| **Plendil** | | | | | | | | | | | | | | | | |
| Value to Medco | $0 | $0 | $0 | $4,737 | $54,709 | $90,650 | $80,845 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $245,341 |
| Additional Value to Medco (AZ View) | $0 | $0 | $0 | $107,856 | $92,267 | $35,334 | $73,284 | $155,733 | $230,064 | $292,522 | $286,942 | $337,645 | $2,474,690 | | | $3,976,557 |
| Variance | $0 | $0 | $0 | $103,119 | ($54,442) | ($55,316) | ($7,581) | $155,733 | $230,064 | $292,522 | $286,942 | $337,645 | $2,474,690 | | | $3,726,516 |
| **FEP - Nexium** | | | | | | | | | | | | | | | | |
| Value to Medco | $0 | $0 | $0 | $1,118,215 | $1,171,082 | $1,207,427 | $1,035,385 | $994,338 | $1,188,610 | $1,091,474 | $0 | $0 | $0 | $0 | $0 | $7,708,144 |
| Additional Value to Medco (AZ View) | $0 | $0 | $0 | $1,110,983 | $1,110,983 | $1,074,025 | $1,074,025 | $1,074,025 | $1,074,025 | $1,074,025 | $1,074,025 | $1,074,025 | $1,074,025 | $1,074,025 | $1,074,025 | $12,937,359 |
| Variance | $0 | $0 | $0 | ($7,635) | ($80,499) | ($94,654) | $38,640 | $75,000 | ($111,585) | ($87,446) | $1,074,025 | $1,074,025 | $1,074,025 | $1,074,025 | $1,074,025 | $5,190,834 |
| **Total Value** | | | | | | | | | | | | | | | | |
| Total Value to Medco | $1,762,570 | $1,710,842 | $2,276,517 | $4,613,620 | $5,075,060 | $5,534,272 | $4,457,478 | $3,050,046 | $3,984,833 | $3,661,632 | $3,058,995 | | | | | $35,203,949 |
| Total Additional Value to Medco (AZ View) | $3,128,454 | $2,328,550 | $3,282,076 | $5,335,030 | $5,305,894 | $4,928,543 | $4,107,704 | $4,831,816 | $4,601,895 | $5,128,692 | $5,595,668 | $8,355,315 | $10,199,364 | $4,207,489 | | $79,476,359 |
| Variance | $1,363,876 | $617,708 | $1,003,658 | $622,319 | $1,231,627 | ($665,728) | $1,649,241 | $1,780,870 | $1,230,267 | $3,067,836 | $5,595,668 | $8,355,315 | $10,199,364 | $4,207,489 | | $44,272,410 |

| Total Value thru October | $62,788,993 |
|---|---|
| Remaining FEP Nexium | $0 |
| Total Value Tracking to $60M | ($2,788,993) |

| Remaining Full Year Value | $79,476,351+ |
|---|---|
| Projected Full Year Value to $60 M | $60 M |
| Projected Excess / (Shortfall) to $60 M | ($19,476,351)+ |

Total $66M value
Toprol XL 25mg/50mg - increase PD to 90% from previous 75% for October thru April, for May forward, apply spread between 85.5% and 94%
Toprol XL 100mg/200mg - increase PD to 90% from previous 80% for October through July, for August forward, apply spread between 82.5% and 90%
Prilosec 40mg - 55% PD plus 2% cash discount
Plendil - 48% PD plus 2% cash discount, only apply spread to current generic discount
FEP - earn full FCR rebate on Nexium (5% base, 46% incentive, 5% PD), apply 5% spread to standard Nexium rebate

| Product | Oct 07 | Nov 07 | Dec 07 | Jan 08 | Feb 08 | Mar 08 | Apr 08 | May 08 | Jun 08 | Jul 08 | Aug 08 | Sep 08 | Oct 08 | Nov 08 | Dec 08 | Total Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Toprol XL 25mg & 50mg** | | | | | | | | | | | | | | | | |
| WAC purchases | $8,913,301 | $10,770,038 | $12,314,914 | $8,893,066 | $10,911,432 | $9,807,032 | $9,879,435 | $11,672,173 | $9,722,392 | $12,286,437 | $9,423,078 | $10,791,198 | $0 | $0 | $0 | |
| Incremental discount | 15.00% | 15.00% | 15.00% | 15.00% | 15.00% | 15.00% | 15.00% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 0.00% | 0.00% | 0.00% | |
| Value to Medco | $1,009,995 | $1,292,405 | $1,477,790 | $1,077,958 | $1,309,372 | $1,178,844 | $1,185,532 | $793,708 | $681,123 | $854,118 | $640,780 | $733,801 | $0 | $0 | $0 | $12,253,025 |
| | $1,138,695 | $1,615,506 | $1,547,237 | $1,247,440 | $1,630,718 | $1,471,055 | $1,481,316 | $992,138 | $928,403 | $1,042,647 | $800,941 | $917,252 | $0 | $0 | $0 | $16,516,281 |
| **Toprol XL 100mg & 200mg** | | | | | | | | | | | | | | | | |
| WAC purchases | $7,415,728 | $8,334,380 | $9,202,561 | $8,762,066 | $8,360,760 | $7,865,121 | $7,131,057 | $9,628,179 | $7,385,444 | $6,157,199 | $7,530,673 | $8,684,106 | $0 | $0 | $0 | |
| Incremental discount | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 4.50% | 4.50% | 0.00% | 0.00% | 0.00% | |
| Value to Medco | $593,258 | $658,750 | $736,205 | $540,168 | $659,861 | $629,210 | $570,485 | $770,254 | $560,836 | $552,576 | $271,428 | $312,631 | $0 | $0 | $0 | $6,894,662 |
| | $741,573 | $823,438 | $920,256 | $675,210 | $838,076 | $786,512 | $713,106 | $962,815 | $738,544 | $516,720 | $330,268 | $380,788 | $0 | $0 | $0 | $8,743,328 |
| Grand total WAC | $16,329,029 | $19,104,418 | $21,517,464 | $15,735,152 | $19,272,192 | $17,672,152 | $17,010,491 | $21,300,352 | $17,107,836 | $20,423,636 | $16,952,749 | $19,475,384 | $0 | $0 | $0 | $24,059,609 |
| | $12,078,868 | $2,435,944 | $2,757,495 | $2,222,669 | $2,472,791 | $2,257,567 | $2,198,021 | $1,954,953 | $1,956,948 | $1,969,387 | $1,140,247 | $1,300,040 | $0 | $0 | $0 | |
| **Prilosec 40mg** | | | | | | | | | | | | | | | | |
| Discount | 0.00% | 0.00% | 0.00% | 57.00% | 57.00% | 57.00% | 57.00% | 57.00% | 57.00% | 57.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |
| Value to Medco | $0 | $0 | $0 | $1,424,380 | $1,787,466 | $1,812,332 | $1,373,304 | $1,249,682 | $1,425,605 | $1,316,602 | $0 | $0 | $0 | $0 | $0 | $10,860,260 |
| **Plendil** | | | | | | | | | | | | | | | | |
| Discount | 0.00% | 0.00% | 0.00% | 12.70% | 12.70% | 12.70% | 12.70% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |
| | $0 | $0 | $0 | $4,737 | $84,709 | $98,830 | $80,846 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $249,841 |
| **FEP - Nexium** | | | | | | | | | | | | | | | | |
| Discount | 0.00% | 0.00% | 0.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | |
| | $0 | $0 | $0 | $1,111,219 | $1,171,082 | $1,207,427 | $1,038,386 | $998,835 | $1,155,610 | $1,081,474 | $1,073,813 | $0 | $0 | $0 | $0 | $5,873,366 |
| | $2,078,668 | $2,435,944 | $2,757,495 | $4,569,985 | $5,496,078 | $5,377,496 | $4,684,555 | $4,303,450 | $4,376,363 | $4,256,543 | $2,216,059 | $1,300,040 | $0 | $0 | $0 | $43,073,057 |

|  |
|---|
| Total to date  $43,073,057 |
| Remaining FEP Nexium  $4,436,978 |
| Remaining Toprol XL  $3,672,430 |
| Additional Med D Crestor for Coventry (3Q08 & 4Q08)  Total  $757,117 |
| $52,740,192 |
| Grand Total Variance  ($7,259,808) |
| Projected 2009 Value  $28,000,556 |
| Shortfall  ($11,999,344) |

## AstraZeneca Value Added Tracking Schedule
All of the below data is based on mail dispensed volume

**2007 Value: $20M**
Toprol XL - increase PD to 90% for all strengths (last 3months of '07 and first 2months of '08)
Prilosec 40mg - 55% PD plus 2% cash discount for all of 2008

**2008 Value: $40M**
Toprol XL - increase PD to 90% for all strengths (10months of 2008)
Plendil - 48% PD plus 2% cash discount, only apply spread to current 39% generic discount and 2% net cash discount
FEP - earn full FCR rebate on Nexium (6% base, 49% incentive, 5% PD)

| Product | Oct 07 | Nov 07 | Dec 07 | Jan 08 | Feb 08 | Mar 08 | Apr 08 | May 08 | Jun 08 | Jul 08 | Total to Task |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Toprol XL 25mg & 50mg** | | | | | | | | | | | |
| Total Value to Medco | $1,157,906 | $1,124,479 | $1,499,817 | $1,287,484 | $1,346,127 | $1,646,130 | $1,295,122 | $0 | $0 | $0 | $9,357,066 |
| **Toprol XL 100mg & 200mg** | | | | | | | | | | | |
| Total Value to Medco | $604,672 | $586,362 | $778,700 | $678,819 | $705,655 | $888,223 | $672,821 | $702,449 | $850,217 | $660,719 | $7,108,636 |
| Grand total Value to Medco | $1,762,578 | $1,710,842 | $2,278,517 | $1,966,304 | $2,051,782 | $2,514,352 | $1,967,943 | $702,449 | $850,217 | $660,719 | $16,465,704 |
| **Prilosec 40mg** | | | | | | | | | | | |
| Value to Medco | $0 | $0 | $0 | $1,424,360 | $1,787,496 | $1,812,932 | $1,373,304 | $1,349,562 | $1,625,805 | $1,316,802 | $10,690,260 |
| **Plendil** | | | | | | | | | | | |
| Value to Medco | $0 | $0 | $0 | $4,737 | $64,709 | $99,550 | $80,845 | $0 | $0 | $0 | $249,041 |
| **FEP - Nexium** | | | | | | | | | | | |
| Value to Medco | $0 | $0 | $0 | $1,118,219 | $1,171,082 | $1,207,437 | $1,035,385 | $998,935 | $1,185,610 | $1,081,474 | $7,798,144 |
| **Total Value** | $1,762,578 | $1,710,842 | $2,278,517 | $4,513,620 | $5,075,069 | $5,634,272 | $4,457,478 | $3,050,946 | $3,661,632 | $3,058,995 | $35,203,949 |

| | |
|---|---|
| Total Value to date | $35,203,949 |
| Remaining FEP Nexium | $5,570,103 |
| Total Value Tracking to $60M | $40,774,051 |
| Grand Total Variance vs. $60M | ($19,225,949) |

*Privileged and Confidential*
*Communication of Counsel*

*R&G Draft of 9/22/06*

**Project GenX**
**Executive Summary of Distribution Agreement by and Between**
**AstraZeneca LP and Par Pharmaceutical, Inc.**

This document summarizes the business terms of the distribution agreement effective as of August 10, 2006, by and between AstraZeneca LP and Par Pharmaceutical, Inc. with respect to an authorized generic version of metoprolol succinate. Because of the length and complexity of the distribution agreement, if questions arise with respect to the rights or obligations of the parties, the specific provisions of the agreement and/or AZ Legal should be consulted.

**I. Business Arrangement**

| Subject | Description of Terms | Relevant Article(s)/ Section(s) of Distribution Agreement |
|---|---|---|
| Term | • Begins on 8/10/06 and ends when the product may no longer be promoted by Par or on 8/10/08, if no launch has yet occurred.<br><br>• The term may be extended for additional one-year periods if the parties agree to do so 6 months in advance of the expiration of the term. | Article 14 generally. |
| Scope of Rights Granted to Par | • Right to sell an unbranded generic version of metoprolol succinate in the U. S. and Puerto Rico.<br><br>• Right to sell arises on a dosage-by-dosage basis (25 mg, 50 mg, 100 mg and 200 mg), as of a date or dates determined by AZ (each, a "Dosage Launch Date").<br><br>• AZ must provide written notice of any Dosage Launch Date it does designate.<br><br>• Once launch has occurred, Par will have the right to sell that dosage strength for two years, and the parties may agree to extend such period for successive one-year periods. | Section 2.1. |
| Limitations on Par's Rights | • Par may not sell to the following mail-service pharmacy providers: | Sections 2.1 and 2.2. |

Block the
sell to
Key Nexium
?

*Privileged and Confidential*
*Communication of Counsel*

*R&G Draft of 9/22/06*

| Subject | Description of Terms | Relevant Article(s)/ Section(s) of Distribution Agreement |
|---|---|---|
| | ○ Caremark, Inc. & CaremarkPCS, Inc.; SilverScript, Inc. | |
| | ○ Medco Health Solutions, Inc. | |
| | ○ Express Scripts, Inc.; Express Scripts Senior Care Holdings, Inc. | |
| | ○ WellPoint Pharmacy Management; Professional Claim Services, Inc. d.b.a. WellPoint Pharmacy Management and Anthem Prescription Management, LLC | |
| | ○ RxSolutions, Inc., d.b.a. Prescription Solutions©; United Health Group; Ovations | |
| | ○ Department of Veterans Affairs (except that Par is permitted to participate in the Federal Supply Schedule contract with respect to metoprolol succinate) | |
| | ○ Prime Therapeutics, LLC | |
| | • Par may not sell the product or perform its contractual obligations through third parties but may sell/promote the product through a Par affiliate if AZ consents. | |

## II.  Financial Terms

| Subject | Description of Terms | Relevant Article(s)/ Section(s) of Distribution Agreement |
|---|---|---|
| Purchase Price Calculation | • Par will pay AZ a two-part purchase price for the product— a fixed "Base Purchase Price" plus a "Deferred Purchase Price," which is based on sales. | Article 3 generally; Sections 3.1-3.4.1. |
| | • The Base Purchase Price for each strength is as follows: | |

## DiMattia, Paul

| | |
|---|---|
| **From:** | Robinson, Kimberly |
| **Sent:** | Friday, January 18, 2008 12:47 PM |
| **To:** | DiMattia, Paul |
| **Subject:** | FW: Need Approval: ESI 2009 Part D contract for Zomig |

Paul,

Marion approved it.. long story but in short we never want to make reference to the Part D
bid impacting the commercial bid in an email. My bad, but in this case the customer makes
it very clear about this link.. we just need to always look at them separate, which legal
always advises us to do and be less communicative in our messaging. Perhaps next time she
will feel comfortable calling me directly..

Kim

-----Original Message-----
From: Groth, Joseph
Sent: Thursday, January 17, 2008 3:15 PM
To: Eller, Barbara E; Robinson, Kimberly
Subject: FW: Need Approval: ESI 2009 Part D contract for Zomig


-----Original Message-----
From: McCourt, Marion
Sent: Thursday, January 17, 2008 2:43 PM
To: Groth, Joseph
Subject: Re: Need Approval: ESI 2009 Part D contract for Zomig


Approve, thx Joe

----- Original Message -----
From: Groth, Joseph
To: McCourt, Marion
Cc: Shaughnessy, Robert J; Robinson, Kimberly; Graham, Ken (Marketing Sales)
Sent: Thu Jan 17 14:40:08 2008
Subject: RE: Need Approval: ESI 2009 Part D contract for Zomig

Marion,

Thanks for the opportunity to discuss this Zomig bid and your concerns about the comment
below (#2) that references ESI's commercial business. It is our policy to develop
Medicare Part D contract offers exclusive of issues that are pertinent to the customer's
commercial business. That said, many Part D Plans, including ESI, have actively
communicated to AstraZeneca that they intend to align their Part D and Commercial
formularies to achieve internal efficiencies which is the origin of the comment below.

This Bid was in fact developed based on opportunity that exists for Zomig in ESI Part D
Plans. My discussion with Bob Shaughnessy confirmed that you should approve or reject
this Bid based on your assessment of the product opportunity in ESI Part D Plans. As you
know, Kim is relatively new to her role and I have followed up with her to clarify our
policies for making contract offers to Medicare Plans. If you have any additional
questions or concerns please don't hesitate to call my mobile phone (215-901-7873).

Joe

     -----Original Message-----
     From:      McCourt, Marion
     Sent: Wednesday, January 16, 2008 1:34 PM
     To:    Groth, Joseph

1

Subject:     FW: Need Approval: ESI 2009 Part D contract for Zomig

pls give me a quick call when you get a chance

thx., most likely on cell

Marion


-----Original Message-----
From:      Robinson, Kimberly
Sent: Wednesday, January 16, 2008 1:02 PM
To:   McCourt, Marion
Cc:   Robinson, Kimberly; DiMattia, Paul
Subject:    Need Approval: ESI 2009 Part D contract for Zomig

Marion,

The ESI 2009 Part D contract for Zomig is up for bid.  Given ESI's unique process whereby all brands will bid at the same time for the grid format and we are looking to submit approvals for CARP review by 1/18/08.  Attached is a slide deck explaining our opportunities for Zomig with ESI.
     Two important facts to consider:
     1.) The Part D lives at ESI are dropping from 1.8MM to 650K thousand for 2009 due to employer retiree lives that have shifted from Part D back to ESI commercial.
     2.) The custom plans at ESI represent most of the remaining Part D lives and they expect to have similar formularies in Part D as they do in commercial.  Therefore, a NO bid could cause them to take Zomig off on the Commercial side of the business.
     3.) WAC Sales are approx. 600K for Zomig on Part D side
     4.) Expectation is to offer 2nd tier only (same as last year)
     5.) We are not bidding for TXL or Atacand for 2009

Lastly, Here are the MS trends for the past year:

|          | 1Q07 | 2Q07 | 3Q07 | 4Q07 | Dec07 |    |    |
|----------|------|------|------|------|-------|----|----|
| Imitrex  |      | 59   |      | 61   | 61    | 62 | 62 |
| Maxalt   | 16   | 14   | 14   | 15   | 15    |    |    |
| Zomig    | 14   | 12   | 12   | 11   | 10    |    |    |
| Relpax   | 7    | 7    | 7    | 6    | 6     |    |    |


I believe that while the lives will be changing in this segment, it still offers up an opportunity for Zomig share.  We have not discussed a new strategy for Part D for Zomig, however there are opportunities with larger PBMs like ESI to grow share across the nation.  At this point we are on par with NMS for Zomig at this account.

Below are the approvals from ALT:
 << File: Approve Approval Needed  ESI Part D  Zomig Dimattia.rtf >>  << File: Approve Approval Needed  ESI Part D  Zomig Streck.rtf >>

Kim
 << File: ESI PSG Update for MASCO 2009 CD version1.ppt >>


Kimberly A. Robinson, MS, MBA
MM Brand Strategy/Contracting Director
Azenity /Merrem Products
AstraZeneca Pharmaceuticals
302-885-4898  VM 54898
610-306-0925 Mobile

2